FILED: APRIL 22, 2008
08CV2296                    TG
JUDGE COAR
MAGISTRATE JUDGE DENLOW

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BAJER DESIGN & MARKETING, INC.,<br>a Wisconsin corporation,<br>        Plaintiff<br><br>        v.<br><br>BASE4 GROUP, INC.,<br>a Delaware corporation,<br>        Defendant. | COMPLAINT<br><br>JURY TRIAL DEMANDED<br><br>Case No. _____ |

Plaintiff Bajer Design & Marketing, Inc., a Wisconsin Corporation, by its attorneys, Ryan Kromholz & Manion, S.C. by Joseph A. Kromholz and John M. Manion and Staes & Scallan, P.C. by Andrew Staes, Stephen Scallan and Joshua Whiteside, as and for its Amended Complaint alleges as follows:

1.      This action arises under the Patent Laws of the United States, 35 U.S.C. §§ 271 et seq. and under the trademark laws of the United States, 15 U.S.C. §§ 1051 et seq and is a complaint for patent infringement and trademark infringement.

## JURISDICTION AND VENUE

2.      The Court has personal jurisdiction over Defendant BASE4 because Infringing Products have been sold in this district.

3.      The Court has personal jurisdiction over Defendant BASE4 because Infringing Products have been offered for sale in this district.

4.     Venue in this action is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant BASE4 resides in this district as the term "resides" is defined in 28 U.S.C. § 1391(c).

5.     Venue in this action is proper in this district pursuant to 28 U.S.C. § 1400(b) and 28 U.S.C. § 1391(c) because Defendant BASE4 resides in this district as the term "resides" is defined in 28 U.S.C. § 1391(c) and because Defendant BASE4 is subject to personal jurisdiction in this district.

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1337, and 1338(a).

7.     This Court has original federal question jurisdiction and supplemental jurisdiction over this action under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338 & 1367(a),

8.     This Court has personal jurisdiction, under one or more subsections of 735 Ill. Comp. Stat. 5/2-209, over Defendant BASE4 because, upon information and belief, Infringing Products have been offered for sale in this district.

9.     This Court has personal jurisdiction, under one or more subsections of 735 Ill. Comp. Stat. 5/2-209, over Defendant BASE4 because, upon information and belief, Infringing Products have been sold in this district.

## THE PARTIES

10.     Plaintiff Bajer Design & Marketing, Inc. (Plaintiff Bajer Design) is a corporation organized under the laws of the State of Wisconsin.

2

11.    Plaintiff Bajer Design has its principal place of business at 1801 Airport Road, Waukesha, Wisconsin, 53188.

12.    Plaintiff Bajer Design is engaged in the business of manufacturing, marketing and selling, *inter alia*, collapsible containers including foldable hampers.

13.    Defendant Base4 Group, Inc. (Defendant BASE4) is a Delaware Corporation having its headquarters at 14001 Dallas Parkway, Suite 560, Dallas, TX 75240.

14.    Defendant BASE4 is engaged in the business of manufacturing, marketing, and selling, *inter alia*, collapsible containers including foldable hampers.

## FACTUAL BACKGROUND AND NATURE OF THE CASE

15.    Plaintiff Bajer Design is the owner by assignment of U.S. Patent No. 5,964,533 ("the '533 patent" attached as <u>Exhibit 1</u>, the assignment attached as <u>Exhibit 2</u>) entitled "Hamper Apparatus and Methods"

16.    Plaintiff Bajer Design is the owner by assignment of U.S. Patent No. RE37,924 ("the '924 patent" attached as <u>Exhibit 3</u>, the assignment attached as <u>Exhibit 4</u>) entitled "Collapsible Container and Method of Making and Using Same."

17.    Plaintiff Bajer Design has the sole right to license others to manufacture, import, use, offer to sell, and sell products claimed in the '533 patent.

18.    Plaintiff Bajer Design has the sole right to license others to manufacture, import, use, offer to sell, and sell products claimed in the '924 patent.

19.     Defendant BASE4 is not licensed to manufacture, import, use, offer to sell, or sell products claimed in the '533 patent.

20.     Defendant BASE4 is not licensed to manufacture, import, use, offer to sell, or sell products claimed in the '924 patent.

21.     Defendant BASE4 is a corporation that sells and offers for sale, foldable hampers and collapsible containers ("the Infringing Products").

22.     The Infringing Products include a "1 Pop-Up Hamper" (attached as Exhibit 5).

23.     The Infringing Product identified in Exhibit 5 is marked with the Notice:  "© 2007 Distributed by Defendant BASE4 Dallas, TX  75240 All Rights Reserved Made in China".

24.     The Infringing Product identified in Exhibit 5 has no patent marking.

25.     The Infringing Product identified in Exhibit 5 includes four flexible tension loops.

26.     The four flexible tension loops identified in Exhibit 5 are spring form steel.

27.     The Infringing Product identified in Exhibit 5 includes four flexible panels arranged in a substantially rectangular configuration.

28.     The Infringing Product identified in Exhibit 5 includes four flexible panels of mesh fabric through which light passes.

29.    The Infringing Product identified in Exhibit 5 includes each of the panels coupled to and substantially encircled by one of the flexible tension loops.

30.    The Infringing Product identified in Exhibit 5 includes a rectangularly shaped flexible bottom coupled to each of the panels.

31.    The Infringing Product identified in Exhibit 5 includes a first flexible handle coupled to one of the panels and a second flexible handle coupled to another of the panels, so that, the handles are on non-adjacent sides of the substantially rectangular configuration of panels.

32.    The Infringing Product identified in Exhibit 5 is a collapsible container having an open top.

33.    The Infringing Product identified in Exhibit 5 includes a plurality of adjacent side panels.

34.    The Infringing Product identified in Exhibit 5 includes a plurality of adjacent side panels wherein each of the side panels includes a continuous, non-interrupted, planar web having a perimeter.

35.    The Infringing Product identified in Exhibit 5 including an edging attached to substantially the entire perimeter of the web and forming a continuous peripheral pocket and a continuous loop frame.

36.    The Infringing Product identified in Exhibit 5 includes a frame being positioned within the continuous pocket.

37.    The Infringing Product identified in Exhibit 5 includes side panels having a bottom side, a top side and two lateral sides.

38.    The Infringing Product identified in Exhibit 5 includes a floor panel having a plurality of sides, each of said floor panel sides being attached to at least one of said side panel bottom sides.

39.    The Infringing Product identified in Exhibit 5 includes the lateral sides of each side panel being attached to the lateral side of an adjacent side panel.

40.    Plaintiff Bajer Design owns a federal trademark registration POP OPEN®. Since approximately 1997, Plaintiff Bajer Design has used and promoted the POP OPEN® mark in connection with collapsible containers for household use.

41.    Plaintiff Bajer Design brings this action to stop Defendant BASE4 from the unauthorized and infringing use of Plaintiff Bajer Design' registered POP OPEN® mark. Defendant BASE4's use of the POP UP® mark on identical goods is likely to cause confusion, mistake or to deceive the public as to the source of the Defendant BASE4's goods, and as to the existence of a connection, affiliation or sponsorship between the Defendant BASE4 and Plaintiff Bajer Design, when no such connection or affiliation exists.

42.    This action seeks permanent injunctive relief, monetary relief, and attorneys' fees (for any acts of infringement determined to be willful) based on Defendant BASE4's violation of: (1) the Patent Laws of the United States; (2) Section 32 of the Lanham Trademark Act of 1946, as amended (the "Lanham Act"), 15 U.S.C. § 1114 (federal trademark infringement); (3) Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)

(federal unfair competition and false designation of origin); (4)   The Illinois
Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1, et seq. ILCS, and
the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2(a)(2) and (3).

43.     Plaintiff Bajer Design owns a federal trademark registration for its POP OPEN®
        mark, Fed. Reg. No. 2,276,917 for use on a "collapsible containers first use anywhere
        at least as early as 1997 and use in commerce at least as early as 1997. *See* Certificate
        of Registration No. 2,276,917(attached hereto as "Exhibit 6").

44.     At all times material hereto, Plaintiff Bajer Design' federal trademark registration has
        been, and continues to be, valid and subsisting.

45.     Plaintiff Bajer Design began using the POP OPEN® mark in commerce over one
        decade ago. Since that time, Plaintiff Bajer Design has continuously and extensively
        used the POP OPEN® mark across the United States in connection with
        distribution of its collapsible containers for household uses.

46.     Plaintiff Bajer Design has invested substantial amounts of time and effort in
        advertising and promotion to develop the widespread goodwill associated with its
        POP OPEN® mark.

47.     The POP OPEN® mark and associated trade names are recognized by consumers as
        representing Plaintiff Bajer Design' high-quality goods.

48.     Defendant BASE4 sells virtually identical collapsible containers for household uses
        that, upon information and belief, Defendant BASE4 caused to be imported from
        China (hereinafter "the Defendant BASE4 Chinese product").

49.    The Chinese collapsible containers for household uses imported by Defendant
       BASE4 are depicted in Exhibit 5.

50.    An actual Plaintiff Bajer Design POP OPEN® collapsible containers for household
       use looks as depicted in Exhibit 7.

51.    The Defendant BASE4 Chinese product and the actual POP OPEN® collapsible
       containers for household uses are substantially identical in appearance (attached
       hereto as "Exhibit 8").

52.    Defendant BASE4 refers to the Defendant BASE4 Chinese product as a "1 POP-
       UP HAMPER." *See* Exhibit 9.

53.    The Defendant BASE4 Chinese product is not an actual POP OPEN® collapsible
       container for household use that is manufactured or sold by Plaintiff Bajer Design.

54.    Defendant BASE4 has used the term "POP-UP" to identify the Defendant BASE4
       Chinese product.

55.    Defendant BASE4's "POP-UP" designation is confusingly similar to Plaintiff Bajer
       Design's POP OPEN® registration.

56.    The Defendant BASE4 Chinese product is a collapsible container for household use.

57.    An actual POP OPEN® product is a collapsible container for household use.

8

58.   The Defendant BASE4 Chinese product and actual POP OPEN® collapsible containers for household uses are identical in function.

59.   Defendant BASE4 competes with Plaintiff Bajer Design.

60.   Actual POP OPEN® collapsible containers for household uses are sold through the same channels of trade as the Defendant BASE4 Chinese product.

61.   Upon information and belief, consumers who purchase the Defendant BASE4 Chinese product consumers who purchase actual POP OPEN® collapsible containers for household uses would be the typical customers of retailers such as Target and/or Wal-Mart.

62.   Upon information and belief, the conditions under which sales are made of the Defendant BASE4 Chinese products, are identical or nearly identical to, the conditions under which sales are made of actual POP OPEN® collapsible containers for household uses.

63.   Upon information and belief, typical buyers to whom sales are made of the Defendant BASE4 Chinese products, are identical or nearly identical to, typical buyers to whom sales are made of actual POP OPEN® collapsible containers for household uses.

64.   Upon information and belief, the degree of care likely to be used by consumers of the Defendant BASE4 Chinese products, is identical or nearly identical to, the degree of care likely to be used by consumers of actual POP OPEN® collapsible containers for household uses.

65.   The Defendant BASE4 Chinese product is closely related, if not identical, to actual POP OPEN® collapsible containers for household use.

66.   Defendant BASE4's use of the POP OPEN® mark is likely to cause confusion or mistake or deceive the public into believing that the Defendant BASE4 is affiliated with, connected to or associated with Plaintiff Bajer Design.

67.   Defendant BASE4's use of the POP OPEN® mark is likely to cause confusion or mistake or to deceive the public as to the origin, sponsorship or approval of Defendant BASE4's goods by Plaintiff Bajer Design.

68.   Unless enjoined, the Defendant BASE4 will continue to infringe and violate Plaintiff Bajer Design's rights in its POP OPEN® mark, which will irreparably harm Plaintiff Bajer Design and cause Plaintiff Bajer Design to suffer damage, including but not limited to, damage to its goodwill and business reputation.

## COUNT I- PATENT INFRINGEMENT

69.   Plaintiff Bajer Design re-alleges and incorporates by reference paragraphs 1-68 of the Complaint.

70.   Defendant BASE4's manufacture, use, offer for sale, and sale of the Infringing Products including the Infringing Product identified in Exhibit 5 is an infringement of Plaintiff Bajer Design's rights under the '533 patent.

10

71.    Defendant BASE4's manufacture, use, offer for sale, and sale of the Infringing Product identified in Exhibit 5 is an infringement of at least one claim of the '533 patent.

72.    Defendant BASE4's manufacture, use, offer for sale, and sale of the Infringing Products including the Infringing Product identified in Exhibit 5 is an infringement of Plaintiff Bajer Design's rights under the '924 patent.

73.    Defendant BASE4's manufacture, use, offer for sale, and sale of the Infringing Product identified in Exhibit 5 is an infringement of at least one claim of the '924 patent.

## Count II (Trademark Infringement – 15 U.S.C. § 1114)

74.    Plaintiff Bajer Design re-alleges and incorporates by reference paragraphs 1-68 of the Complaint.

75.    Defendant BASE4 has used words, terms, names and colorable imitations of Plaintiff Bajer Design' POP OPEN® mark in connection with the sale, offering for sale or advertising of goods.

76.    Upon information and belief, Defendant BASE4's use of Plaintiff Bajer Design' POP OPEN® mark is likely to cause confusion, mistake or deceive an appreciable number of ordinary buyers as to the source of or association of those goods with Plaintiff Bajer Design.

77.   Defendant BASE4's conduct constitutes trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

78.   By reason of the foregoing acts of the Defendant BASE4, Plaintiff Bajer Design has sustained, and unless enjoined will continue to sustain, substantial injury and damage.

79.   Defendant BASE4's acts have caused Plaintiff Bajer Design irreparable harm and, unless enjoined, will continue to cause Plaintiff Bajer Design continuing irreparable harm.

80.   Plaintiff Bajer Design has no adequate remedy at law.

## Count III (Unfair Competition/False Designation of Origin

## – 15 U.S.C. § 1125(a))

81.   Plaintiff Bajer Design re-alleges and incorporates by reference paragraphs 1-68 and 75-80 of the Complaint.

82.   Upon information and belief, Defendant BASE4's use of its 'POP-UP' mark for identical goods (e.g. collapsible containers for household uses) is likely to cause confusion, or to cause mistake, or to deceive an appreciable number of ordinary buyers as to the source of or association of those goods with Plaintiff Bajer Design.

83.   The foregoing acts of the Defendant BASE4 constitute unfair competition and false designation of origin in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a).

12

84.    By reason of the foregoing acts of Defendant BASE4, Plaintiff Bajer Design has
       sustained, and unless enjoined will continue to sustain, substantial injury and damage.
       Defendant BASE4's acts, unless enjoined, will cause Bajer Design continuing
       irreparable harm.

85.    Plaintiff Bajer Design has no adequate remedy at law.

## Count IV (COMMON LAW TRADEMARK INFRINGEMENT)

86.    Plaintiff Bajer Design re-alleges and incorporates by reference paragraphs 1-68 and
       75-85 of the Complaint.

87.    Defendant BASE4's use of Plaintiff Bajer Design' POP OPEN® mark for both
       related and identical goods is likely to cause confusion, or to cause mistake, or to
       deceive an appreciable number of ordinary buyers as to the source of or association
       of those goods with Plaintiff Bajer Design.

88.    Defendant BASE4's use of Plaintiff Bajer Design' POP OPEN® mark has caused
       and, unless enjoined, will continue to cause irreparable harm to Plaintiff Bajer
       Design.

89.    Plaintiff Bajer Design has no adequate remedy at law.

90.    Defendant BASE4's activities as stated herein constitute an infringement of Plaintiff
       Bajer Design' common law trademark rights in the name POP OPEN® within the
       state of Illinois and in violation of Illinois law.

## COUNT V (COMMON LAW UNFAIR COMPETITION)

91.    Plaintiff Bajer Design re-alleges and incorporates by reference paragraphs 1-68 and 75-90 of the Complaint.

92.    Plaintiff Bajer Design' POP OPEN® mark is distinctive and has acquired secondary meaning and is thereby a valid common law trademark.

93.    Plaintiff Bajer Design is the rightful owner of all common law rights in the POP OPEN® mark.

94.    Defendant BASE4's use of Plaintiff Bajer Design' POP OPEN® mark for both related and identical goods is likely to cause confusion, or to cause mistake, or to deceive an appreciable number of ordinary buyers as to the source of or association of those goods with Plaintiff Bajer Design.

95.    Defendant BASE4 could have chosen any number of alternative non-infringing marks, but instead chose to use "POP OPEN™" to describe the Defendant BASE4 Chinese product, which is confusingly similar to Plaintiff Bajer Design' POP OPEN® mark and blemishes the distinctiveness of Plaintiff Bajer Design' POP OPEN® mark..

96.    Defendant BASE4's acts constitute unfair competition, unfair trade practice and infringement of Plaintiff Bajer Design' common law rights and are in violation of the common law of the State of Illinois.

97.    Defendant BASE4's use of Plaintiff Bajer Design' POP OPEN® mark is done with willful intent, harmful motive and reckless indifference to Plaintiff Bajer Design' rights.

98.    Defendant BASE4 has been unjustly enriched by their acts.

99.    Defendant BASE4's use of Plaintiff Bajer Design' POP OPEN® mark has caused and, unless enjoined, will continue to cause irreparable harm to Plaintiff Bajer Design.

100.    Plaintiff Bajer Design has no adequate remedy at law.

101.    Plaintiff, as a direct and proximate result of aforesaid acts of infringement and has suffered both past, present, and on-going monetary damages in an amount to be determined at trial.

## COUNT VI (VIOLATION OF ILLINOIS CONSUMER FRAUD ACT)

102.    Plaintiff Bajer Design realleges and incorporates by reference paragraphs 1 - 101 of the Complaint.

103.    Defendant BASE4's conduct implicates consumer concerns.

104.    Defendant BASE4's conduct, as alleged above, causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services and causes likelihood of confusion or of misunderstanding as to the

15

affiliation, connection or association with or certification by another, in violation of
815 ILCS 510/2(a)(2) and (3).

105.    The foregoing violation of the Uniform Deceptive Trade Practices Act violates the
Illinois Consumer Fraud and Deceptive Practices Act. 815 ILCS 505/1, et seq.

WHEREFORE, Plaintiff Bajer Design prays for relief as follows:

A.    For a decree adjudging that United States Letters Patent No. 5,964,533
has been infringed by Defendant BASE4 and that Plaintiff Bajer Design
has been damaged by said infringement.

B.    For an injunction permanently enjoining the Defendant BASE4, its
officers, agents, servants, employees and attorneys, and those persons in
active concert or participation with them who receive actual notice of the
decree of this Court by personal service or otherwise, from directly or
indirectly infringing the claims of United States Letters Patent No.
5,964,533.

C.    For an accounting and damages against Defendant BASE4, according to
proof at the time of trial, for all damages suffered by Plaintiff Bajer
Design by reason of the infringement by Defendant BASE4 of United
States Letters Patent No. 5,964,533 in an amount not less than a
reasonable royalty, together with interest and costs, pursuant to 35 USC §
284.

16

D. For a decree adjudging that United States Letters Patent No. RE37,924 has been infringed by Defendant BASE4 and that Plaintiff Bajer Design has been damaged by said infringement.

E. For an injunction permanently enjoining the Defendant BASE4, its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the decree of this Court by personal service or otherwise, from directly or indirectly infringing the claims of United States Letters Patent No. RE37,924.

F. For an accounting and damages against Defendant BASE4, according to proof at the time of trial, for all damages suffered by Plaintiff Bajer Design by reason of the infringement by Defendant BASE4 of United States Letters Patent No. RE37,924  in an amount not less than a reasonable royalty, together with interest and costs, pursuant to 35 USC § 284.

G. For damages in an amount equal to three times the amount of damages found or assessed to compensate Plaintiff Bajer Design for any act of infringement by a Defendant BASE4 that is determined to be a willful, deliberate and intentional act, pursuant to 35 USC § 284.

H. For an award of reasonable attorney fees against the Defendant BASE4, pursuant to 35 USC § 285 and 815 ILCS 50/10A.

17

I. Enjoining the Defendant BASE4, their servants, agents and employees, and all other persons in active concert or participation with the Defendant BASE4, and their successors and assigns, from directly or indirectly:

1. using any of Plaintiff Bajer Design' marks or names including the POP OPEN® mark or any colorable imitation of the POP OPEN® mark in advertising (including signage and on the Internet) or promotions;

2. expressly or impliedly representing themselves to customers, potential customers, suppliers, potential suppliers or the public to be affiliated in any way with Plaintiff Bajer Design;

3. representing by words or conduct that any product or service provided, offered for sale, sold, advertised, or rendered by the Defendant BASE4 is supplied, authorized, sponsored, or endorsed by or otherwise connected Plaintiff Bajer Design; otherwise infringing the POP OPEN® mark and trade names; or

4. competing unfairly with Plaintiff Bajer Design in any manner by improperly using the POP OPEN® mark and trade names, or any mark that is likely to cause confusion with Plaintiff Bajer Design' POP OPEN® marks;

J. Ordering the Defendant BASE4 to deliver up for destruction all labels, signs, prints, insignia, letterhead, brochures, business cards, invoices and any other written or recorded material or advertisements in its possession

18

or control containing the POP-UP mark and trade names, or any colorable imitation of the POP OPEN® mark;

K. Ordering the Defendant BASE4 to file with this Court and serve on Plaintiff Bajer Design within thirty (30) days from the date of entry of any restraining order and/or injunction, a report in writing, under oath, setting forth in detail the manner and form in which the Defendant BASE4 have complied with the terms of the injunction;

L. Ordering the Defendant BASE4 to pay Plaintiff Bajer Design: (1) all profits, gains and advantages obtained from the Defendant BASE4's unlawful conduct, including lost profits and corrective advertising damages in an amount to be determined at trial; (2) all monetary damages sustained and to be sustained by Plaintiff Bajer Design as a consequence of the Defendant BASE4's unlawful conduct, including lost profits, in an amount to be determined at trial; and (3) Plaintiff Bajer Design' costs and disbursements of this action, including reasonable attorneys' fees; or, at Plaintiff Bajer Design' election, statutory damages, of which nothing plead herein shall constitute an election of remedies.

M. For any finding that Defendant BASE4's actions were willful order that the Defendant BASE4's profits or Plaintiff Bajer Design' damages (whichever is greater) be trebled as provided under 15 U.S.C. § 1117(b).

N. Awarding interest on the above damages awards, including prejudgment interest.

O.  That the Defendant BASE4 be directed to pay the Plaintiff Bajer Design costs and interest incurred herein.

P.  That the Plaintiff Bajer Design has such other and further relief as the circumstances of the case may require or as this Court deems just and proper.

DEMAND FOR JURY TRIAL - Plaintiff Bajer Design hereby demands a jury trial on all issues so triable.

Date: _APRil 22. 2008_

RYAN KROMHOLZ & MANION, S.C.

By: _____

Joseph A. Kromholz
 (WI State Bar No. 1002464)
John M. Manion (WI State Bar No. 1021189)
Daniel R. Johnson (WI State Bar No. 1033981)
RYAN KROMHOLZ & MANION, S.C.
P.O. Box 26618
Milwaukee, Wisconsin 53226-0618
Telephone:  (262) 783-1300
Facsimile:  (262) 783-1211

LOCAL COUNSEL

By: _____

Stephen Scallan
 Andrew Staes
Staes & Scallan, P.C.
111 W. Washington Street
Suite 1631
Chicago, IL  60602

Attorneys for Plaintiff-Bajer Design & Marketing, Inc.

20

US005964533A

# United States Patent [19]

## Ziglar

[11] **Patent Number:** **5,964,533**

[45] **Date of Patent:** **Oct. 12, 1999**

[54] **HAMPER APPARATUS AND METHODS**

[75] Inventor: **Paul S. Ziglar**, Burlington, Iowa

[73] Assignee: **LaMont Limited**, Burlington, Iowa

[21] Appl. No.: **08/714,556**

[22] Filed: **Sep. 16, 1996**

[51] **Int. Cl.**[6] ..................................................... **B65D 33/00**

[52] **U.S. Cl.** ................................. **383/36**; 383/2; 383/43; 383/104; 383/117; 32/36

[58] **Field of Search** .................................. 383/43, 44, 2, 383/104, 117, 36; 248/97, 99; D32/36, 37; 141/316, 390

[56]                     **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| Re. 33,842 | 3/1992 | Ebentheuer . |
| 177,749 | 5/1876 | Redden ...................................... 383/36 |
| D. 213,131 | 1/1969 | Hamilton . |
| D. 215,846 | 11/1969 | Curtin et al. . |
| 216,227 | 6/1879 | Sedgwick . |
| 217,362 | 7/1879 | Gardner ..................................... 383/36 |
| 218,277 | 8/1879 | Brown, Jr. . |
| 251,325 | 12/1881 | Walters ..................................... 383/43 |
| D. 274,662 | 7/1984 | Fausel . |
| D. 279,249 | 6/1985 | Fausel . |
| D. 288,019 | 1/1987 | Gebhard et al. . |
| D. 290,538 | 6/1987 | Basore . |
| 481,957 | 9/1892 | Klank . |
| 665,942 | 6/1900 | Tabler ........................................ 383/2 |
| 945,918 | 1/1910 | Crawford . |
| 1,087,702 | 2/1914 | Patten .................................... 383/104 |
| 1,144,643 | 6/1915 | Elkins . |
| 1,181,829 | 5/1916 | Bower . |
| 1,206,618 | 11/1916 | Thrasher ................................ 383/104 |
| 1,263,294 | 4/1918 | Taylor . |
| 1,360,844 | 11/1920 | Williams ................................... 383/43 |
| 1,394,007 | 10/1921 | Hall . |
| 1,520,532 | 12/1924 | Clark . |
| 1,583,083 | 5/1926 | Macaraig ................................ 383/104 |
| 1,640,083 | 8/1927 | Ladd . |
| 1,647,679 | 11/1927 | Williams . |
| 1,703,066 | 2/1929 | Horn . |
| 1,836,297 | 12/1931 | Vienna . |

| | | |
|---|---|---|
| 2,009,035 | 7/1935 | Towers . |
| 2,042,888 | 6/1936 | Flood . |
| 2,071,850 | 2/1937 | Miller . |
| 2,115,308 | 4/1938 | Koch . |
| 2,280,601 | 4/1942 | Otter ......................................... 383/36 |
| 2,295,584 | 9/1942 | Larson . |
| 2,361,743 | 10/1944 | Butler . |
| 2,544,074 | 3/1951 | Walter et al. . |
| 2,600,501 | 6/1952 | Higgs . |
| 2,625,973 | 1/1953 | Weldon . |
| 2,639,819 | 5/1953 | Marks . |
| 2,664,131 | 12/1953 | Miller . |
| 2,721,099 | 10/1955 | Rupp . |
| 2,767,757 | 10/1956 | Marder . |
| 2,780,402 | 2/1957 | Zucker et al. . |

(List continued on next page.)

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 1215335 | 11/1959 | France ....................................... 383/36 |
| 281680 | 8/1913 | Germany ..................................... 383/2 |
| 5939 | 10/1915 | United Kingdom . |
| 140570 | 4/1920 | United Kingdom . |
| 2- 126 535 | 3/1984 | United Kingdom . |
| 2 212 114 | 7/1989 | United Kingdom . |

### OTHER PUBLICATIONS

Patent Application re: prior art product sold in U.S. by Stephen A. Fausel and Paul S. Ziglar: specification for Collapsible Furniture, Jun. 1985.

Eileen Douglas Letter of May 25, 1996.

Eileen Douglas Letter of Aug. 26, 1996.

*Primary Examiner*—J. Casimer Jacyna
*Attorney, Agent, or Firm*—Simmons, Perrine, Albright & Ellwood, PLC

[57]                     **ABSTRACT**

A hamper and method for making and using the same: The hamper is for collection, transport, and removal for such contents as laundry. The hamper features can include a funnel or even a reversible funnel for gravity-induced filling and unfilling of the hamper, as well as a retractably collapsible tension member framework structure.

**7 Claims, 12 Drawing Sheets**



# EXHIBIT 1

**5,964,533**

Page 2

---

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2,833,460 | 5/1958 | Vololato ..................................... 383/36 |
| 2,958,357 | 11/1960 | Vorgan . |
| 3,014,516 | 12/1961 | Mueller . |
| 3,017,117 | 1/1962 | Klingler . |
| 3,061,396 | 10/1962 | Hock . |
| 3,126,933 | 3/1964 | Mason et al. . |
| 3,160,307 | 12/1964 | Morrison . |
| 3,257,077 | 6/1966 | Corning . |
| 3,265,284 | 8/1966 | Tomkins . |
| 3,310,089 | 3/1967 | Silverman . |
| 3,354,924 | 11/1967 | Birrell . |
| 3,410,328 | 11/1968 | Sasai . |
| 3,439,865 | 4/1969 | Port et al. . |
| 3,480,059 | 11/1969 | Schoening . |
| 3,583,748 | 6/1971 | Arndt . |
| 3,603,367 | 9/1971 | Lehrman . |
| 3,661,326 | 5/1972 | Wilson . |
| 3,675,981 | 7/1972 | Mallander . |
| 3,727,786 | 4/1973 | Fausel . |
| 3,732,978 | 5/1973 | Reader . |
| 3,796,342 | 3/1974 | Sanders et al. . |
| 3,799,384 | 3/1974 | Hurkamp . |
| 3,834,528 | 9/1974 | Pcikford et al. ........................ 206/526 |
| 3,843,222 | 10/1974 | Berkun . |
| 3,868,155 | 2/1975 | Cherubini . |
| 3,893,649 | 7/1975 | Cornell . |
| 3,946,903 | 3/1976 | Parker . |
| 3,955,706 | 5/1976 | Whitaker . |
| 4,010,784 | 3/1977 | Nattrass et al. ........................ 383/117 |
| 4,094,639 | 6/1978 | McMillan . |
| 4,118,089 | 10/1978 | Johnson et al. . |
| 4,134,225 | 1/1979 | Welch . |
| 4,180,113 | 12/1979 | Liebling . |
| 4,195,804 | 4/1980 | Hujsak . |
| 4,246,945 | 1/1981 | Sterling . |
| 4,248,278 | 2/1981 | Blodgett ................................. 141/316 |
| 4,248,442 | 2/1981 | Barrett . |
| 4,287,701 | 9/1981 | Washington . |
| 4,299,365 | 11/1981 | Battle . |
| 4,313,634 | 2/1982 | Williams . |
| 4,352,457 | 10/1982 | Weick . |
| 4,401,213 | 8/1983 | Lerner . |
| 4,411,300 | 10/1983 | Rico . |
| 4,427,110 | 1/1984 | Shaw . |
| 4,485,855 | 12/1984 | Dillingham ........................... 141/316 |
| 4,580,776 | 4/1986 | Burkinshaw . |
| 4,585,283 | 4/1986 | Redmon et al. . |
| 4,603,432 | 7/1986 | Marino ......................................... 383/2 |
| 4,610,394 | 9/1986 | Bryson . |
| 4,630,312 | 12/1986 | Milstein ................................. 383/117 |
| 4,630,747 | 12/1986 | Chiang et al. . |
| 4,646,802 | 3/1987 | Basore et al. . |
| 4,683,927 | 8/1987 | Pyzer . |
| 4,706,845 | 11/1987 | Schnurer . |
| 4,715,572 | 12/1987 | Robbins . |
| 4,728,066 | 3/1988 | Lang et al. . |
| 4,730,748 | 3/1988 | Bane . |
| 4,738,478 | 4/1988 | Bean, Jr. . |
| 4,747,701 | 5/1988 | Perkins . |
| 4,759,518 | 7/1988 | Yardas . |
| 4,779,794 | 10/1988 | Moore . |
| 4,781,300 | 11/1988 | Long . |
| 4,783,031 | 11/1988 | Ebentheuer . |
| 4,790,029 | 12/1988 | Lafleur et al. ........................ 383/36 |
| 4,854,501 | 8/1989 | Ricci . |
| 4,858,634 | 8/1989 | McLeese . |
| 4,899,967 | 2/1990 | Johnson . |
| 4,903,584 | 2/1990 | Styles . |
| 4,925,102 | 5/1990 | Jones . |
| 4,940,200 | 7/1990 | Sawyer et al. . |
| 4,946,118 | 8/1990 | Hastings . |
| 4,948,077 | 8/1990 | Gonzalez . |
| 4,953,815 | 9/1990 | Beymer et al. ........................ 248/97 |
| 4,964,859 | 10/1990 | Feldman . |
| 4,989,749 | 2/1991 | Choi . |
| 5,022,767 | 6/1991 | Cardulla . |
| 5,027,748 | 7/1991 | Wolak . |
| 5,031,793 | 7/1991 | Chen . |
| 5,036,999 | 8/1991 | Bitsch . |
| 5,038,812 | 8/1991 | Norman . |
| 5,082,219 | 1/1992 | Blair . |
| 5,118,201 | 6/1992 | Cook ......................................... 383/12 |
| 5,143,283 | 9/1992 | Lancaster . |
| 5,174,462 | 12/1992 | Hames . |
| 5,195,649 | 3/1993 | Wolters . |
| 5,253,775 | 10/1993 | Gould . |
| 5,263,672 | 11/1993 | He . |
| 5,273,142 | 12/1993 | Weber . |
| 5,301,705 | 4/1994 | Zheng . |
| 5,324,490 | 6/1994 | Van Vlahakis . |
| 5,335,805 | 8/1994 | Chen . |
| 5,356,024 | 10/1994 | Ho . |
| 5,358,440 | 10/1994 | Zheng . |
| 5,375,267 | 12/1994 | Davis . |
| 5,382,087 | 1/1995 | Pouch . |
| 5,393,023 | 2/1995 | Callan . |
| 5,429,437 | 7/1995 | Shaw et al. . |
| 5,437,384 | 8/1995 | Farrell . |
| 5,437,410 | 8/1995 | Babasade . |
| 5,449,083 | 9/1995 | Dougherty . |
| 5,464,113 | 11/1995 | Ho . |
| 5,468,061 | 11/1995 | Fries . |
| 5,474,196 | 12/1995 | Fausel . |
| 5,492,675 | 2/1996 | Brizard . |
| 5,576,621 | 11/1996 | Clements ................................. 324/239 |
| 5,593,046 | 1/1997 | Katsuura et al. . |
| 5,746,514 | 5/1998 | Orensten ................................. 383/117 |















Fig. 11



Fig. 12



Fig. 13



*Fig.14*



*Fig.15*



*Fig.16*







Fig. 25

Fig. 26A

Fig. 26B



Fig. 26C

Fig. 26D

Fig. 26E

Fig. 26F



Fig. 27



Fig. 28



Fig. 29



Fig. 30

5,964,533

## 1

## HAMPER APPARATUS AND METHODS

### I. BACKGROUND OF THE INVENTION

#### A. Technical Field of the Invention

The present invention relates to a receptacle apparatus, and method for making and using the same. The receptacle is a hamper for collection, transport, and removal of goods or other articles. In particular, the receptacle can be a laundry hamper or other holder or container for laundry. The receptacle can have a flaccid wall, possibly made of a textile. The wall is intended to be united with a retractably collapsible support or tension member framework structure, with a collapsible wall or a flexible wall being other approaches. The collapsible or foldable framework preferably has a knock down or foldable configuration of spring wire or a similar tension member, such as that which would permit lateral collapsibility.

#### B. Description of the Related Art

It can of course be said that the art of funneling was robust as of the present invention. But the application of a funnel to certain containers may nonetheless be a novel juxtaposition, and it would be premature to say that every invention involving funneling has been made.

For example, people have been locating laundry in and out of laundry hampers for ages, but the Applicant is not aware of any laundry hamper having previously being made with a funnel top to direct the laundry into the hamper. Perhaps this is due to the fact that laundry hampers have been considered bathroom furniture, and a funnel could be deemed an unsightly accoutrement for furniture.

With regard to such containers, again, certain kinds of them have been made rigid, while others have been made collapsible. Examples of rigid containers include wicker laundry hampers and wicker picnic baskets. Consider U.S. patents issued to Stephen A. Fausel (referenced below). On the other hand, a soft, collapsible cooler has been known, along with accordion-style portable water buckets (U.S. Pat. No. 1,454,388), trash canisters (U.S. Pat. No. 3,014,516) large-sized containers (U.S. Pat. No. 3,480,059), bottles (U.S. Pat. No. 3,946,903). None of these have inwardly pointing funnel tops.

Instead, such containers have completely open tops, or hinged tops like laundry hampers, neither of which play an active role in directing items into the container-relegating the task to human positioning, conceivably with the aide of a separate funnel or shute. For example, baskets and containers such as those of U.S. Des. Pat. No. 213,131, U.S. Des. Pat. No. 290,538, U.S. Pat. No. 4,646,802, and U.S. Pat. No. 4,989,749 are presumably loaded by hand. Other containers have separate caps, tops, or doors, like U.S. Pat. Nos. 3,946,903 and 4,246,945, and Fausel's U.S. Pat. No. 5,474,196.

Such containers are often heavy and opaque or of a monotonous color, usually as a consequence of the solid materials with which they are constructed, though occasionally, such containers are painted or otherwise covered over. Consider U.S. Pat. No. 5,464,113 and U.S. Pat. No. 5,356,024, both of which are titled "Collapsible Hamper for Storage of Laundry and Other Items," and both of which list Stanley Ho as the inventor. Such containers would not allow sufficient visual access to determine the contents, and apparently a monotonous coloration may be suitable for a bathroom. See also U.S. Des. Pat. No. 362,931, titled "Laundry Hamper," listing Keith E. Brightbill et al. as inventors; U.S. Des. Pat. No. 344,823, titled "Laundry

## 2

Hamper," listing Mitchell Wilgus et al. as inventors; U.S. Des. Pat. No. 342,365, titled "Clothes Hamper," listing Brian J. Conway et al. as inventors; U.S. Des. Pat. No. 293,383, titled "Hamper," listing Rick L. Thomson as the inventor; U.S. Des. Pat. No. 279,038, titled "Clothes Hamper," listing Rick L. Thomson as the inventor.

Accordingly, the art appears to have overlooked the sources of many problems (as well as the corresponding solution) that have limited this art.

### II. SUMMARY OF THE INVENTION

It is an object of the present invention to provide an improved hamper apparatus and methods for making and using the apparatus.

It is another object of the present invention to provide a hamper improved to solve previously unrecognized problems that have limited this technical art.

It is another object of the present invention to provide such a hamper having a funnel top suitable for using gravity to induce filling of the hamper.

It is another object of the present invention to provide such a hamper having a funnel top suitable for using gravity to induce unfilling of the hamper.

It is still another object of the present invention to provide such a hamper that is restorably collapsible.

It is yet another object of the present invention to provide such a hamper that is restorably collapsible under inducement of a tension member frame.

It is yet a further object of the present invention to provide such a hamper that is suitable for discretely disclosing the extent to which it is full, as well as colorful for location in a bedroom.

These and other objects are carried out with a hamper, such as a retractably collapsible laundry container, topped with a flaccid material and oriented in an upright position, with a slit opening in the top. The opening can function as a funnel or chute to gravity induce material into the container. Further, the funnel has a concave or inward-pointing shape, such that items intended for insertion contact the funnel top on a surface external to the hamper. If the funnel is made of a sufficiently flexible material, when the hamper is inverted so that the items weigh on the funnel, the funnel flexibly moves and is convex or outward-pointing; the goods being removed from the hamper by contacting a surface internal to the hamper. Ergo, it is a hamper with a reversible funnel.

As embodied in an apparatus, the hamper has a wall secured to a top comprising a funnel for funnelling laundry into the hamper. Said another way, the hamper can have a top that functions as a funnel, which can direct material in, and preferably out, of the receptacle. The hamper can be of any functionally suitable shape, and the funnel or channel can slit in the top, the slit leaving the top to sag in a generally concave or convex orientation to use gravity for inducing funnelling in and out of the receptacle.

As to of storage of laundry, goods, property, or other items, the invention pertains to a method of funneling such items into a hamper with a funnel top. Preferably, the funnel is made of a flexible material such that when the hamper is in a vertical position, the items can be funnelled into the hamper, and when the hamper is inverted, the items can then be reverse-funneled out again. More particularly, the hamper preferably is a light-weight collapsible hamper secured to a springed pop-up frame. A method for using such a hamper, like a laundry hamper, can include expanding the hamper

5,964,533

**3**

from a collapsed position, locating the items in the hamper, transporting the items and hamper, removing the items from the hamper, and then deforming the hamper.

More specifically, the funnel can have an exterior side and an interior side, the funnel being positionable so that when the hamper is in an upright orientation the funnel is in a concave position for gravity-directing items on the exterior side of the funnel into the hamper, and when the hamper is in an upside down orientation, the funnel is in a convex position for gravity-directing items on the interior side of the funnel out of the hamper. The hamper wall can be comprised of a deformable material and a tension member frame secured to the wall to induce movement of the hamper from a collapsed position, and to oppose movement of the hamper from an expanded position. Preferably, the hamper is completely self-erecting from the collapsed position to the expanded position. The frame can be secured to the wall by any suitable means to unite them, but pocketing the frame in the material is a convenient approach.

Importantly, the wall material should be capable of discretely indicating the extent to which the hamper is filled. One alternative is for the wall to be comprised of a translucent material for discretely indicating how full the hamper is. Alternatively, or in addition, a deformable wall material can be used for the same purpose. The material preferably has a thickness less than 0.004 inch, and/or woven, say, with at least 50 threads per inch. The material can even be waterproof.

In either of these approaches, it is preferable to color the wall, especially with more than one color, best selected for the intended environment of the hamper. While there may have been a time that such hampers were principally located in a bathroom or laundry room (where minimizing expense and styling led to monotonous coloration), it is believed that such hampers often can better be located in a bedroom—e.g., where a college student keeping a hamper in a dormitory room. Thus, it is sometimes preferable for the hamper wall to be color coordinated for location in a bedroom. It is also desirable to have handles secured adjacent to the top and made of a material softer than the frame, for light weight transport.

The container can generally be in the shape of a geometric solid, such as a cylinder or a polygon, having a top with a funnel. The opening can be a slit in cloth, with or without an overlap or means for closure (e.g., zipper, velcro, or other type of fastener) because when the overlap or closure is opened, the cloth will sag to form a funnel-shaped opening.

The hamper can have a height dimension and a width dimension proportioned such that a ratio of the height dimension to the width dimension is greater than 0.7—or in another embodiment the ratio of the width dimension to the height dimension is greater than 0.7, depending on whether the intended use is for a tall hamper or a short hamper. Consider the following two applications. One calls for a hamper to fit in a narrow, tall space, say, between a radiator and a corner; another calls for a short, squat hamper, e.g., to fit under a bed. In typical applications, the hamper preferably has a height is in the range of 20 to 26 inches and a top has a width in the range of 18 to 20 inches. This realm of structure is suitable for its laundry function, as well as the environment of its use.

More particularly, many hamper shapes and configurations can be used to carry out the conception and spirit of the invention. As a representative example, the hamper can be structured so that the wall is comprised of facets or box shaped. But in contrast, the wall can be curvalinear, as in an

**4**

upwards pointing spring, covered to form cylindrical, conical, or spherical type of shape. Note that the hamper can have a nonretractably deformable base, for example where the structure is carried out with an upwards pointing helical tension member supporting the wall that extends from the nonretractably deformable base. However, the hamper can also have a retractably deformable base or bottom, for example where the base is a loop that can be twisted into a subloop.

As a more detailed discussion of several preferred hamper structures (which tend to be defined by the flexible tension member), consider two approaches: (1) those that when the hamper is in an expanded position, the flexible tension member includes a helical portion between the bottom and the top; and (2) those that do not include a helical portion between the bottom and the top, such as those having some kind of planar spring). As to the latter approach, in the expanded position, some can be configured so that the flexible tension member does not extend from one (of the bottom and the top) to an other (of the bottom and the top), and back to the one again. For example, it is possible to support a hamper with several C-shaped spring members only spanning from top to bottom (or vice versa). This is in contrast to the alternative of having the flexible tension member extending from one (of the bottom and the top) to an other (of the bottom and the top) and back to the one, e.g., as in a configuration where the spring member is shaped like a rubber band centrally draped over a finger. Or one can use a plurality of flexible members, each of the flexible tension members formed in a respective loop, the loops being oriented such that, in the expanded position, each of the loops is defines a respective facet or plane; and in the retracted position: each of the loops does not define a respective facet or plane. In this latter case, when the laundry hamper is not in the upright position, or the upside down position, a portion of a loop forms a base. For example, incorporated by reference is U.S. Pat. No. 5,411,046 for a "Tent," naming Tak Wan as the inventor, which illustrates how the loops can twist into three subloops.

In sum, then, an embodiment of the present invention is a hamper having at least one wall secured to a top and to a base, the top and the base defining an upright orientation for the hamper and an upside down orientation for the hamper, and the top comprises a funnel having an exterior side and an interior side. The funnel is preferably positionable so that when the hamper is in the upright orientation the funnel is in a concave position for gravity-directing material on the exterior side of the funnel into the hamper, and when the hamper is in an upside down orientation, the funnel is in a convex position for gravity-directing material on the interior side of the funnel out of the hamper.

It is desirable to have the hamper have a tension member frame with sufficient spring to deform in response to the hamper being dropped on home a floor and then to resurrect the hamper to the upright position. Better still, the frame can be comprised of a flexible tension member and flexible or flaccid material secured to the frame to form a laundry hamper having an expanded position and a retracted position, the laundry hamper being optionally repositionable to one of the positions. Thus, in the expanded position, the laundry hamper has a bottom, a wall connected to the bottom, and a top connected to the wall, the top having an opening. Laundry hamper has a volume defined by the top, the bottom, and the wall, and the top and the bottom define an upright orientation and an upside down orientation. The tension member induces movement from the retracted position and opposes movement from the expanded position.

5,964,533

5

As to using such a hamper in the context of laundry, several interesting features can be considered relevant, including the feature that the hamper is useful in a first series of steps, like collecting the dirty laundry in a bedroom or other first location, transporting the dirty laundry (preferably by using handles attached to the hamper) to a laundromat or other second location, and disgorging the dirty laundry from the hamper so that it can be cleaned; then, the hamper can be used as a tool to aide in a second series of temps, like transporting the laundry sans dirt by relocating the laundry back in the hamper (preferably folded to neatly occupy less space) at the second location, then transporting the hamper and laundry back to the first location, whereupon the hamper is unloaded again.

More precisely, the method can be considered as including the steps of: first adjusting a retractably collapsible hamper from a collapsed position to an expanded position, wherein the hamper is comprised of a tension member to induce the hamper to move from the retracted position, and the step of first adjusting is carried out so that the tension member induces adjustment from the collapsed position; first locating dirty laundry in the hamper at a first location; first transporting the hamper and the dirty laundry to a second location; removing the dirty laundry from the hamper at the second location; cleaning the dirty laundry to produce clean laundry; then second locating the clean laundry in the hamper at the second location; second transporting the hamper to the first location; removing the clean laundry from the hamper at the first location; and second adjusting the collapsible hamper from the expanded position to the retracted position, wherein the tension member opposes movement from the expanded position.

The method can be carried out with a hamper comprised of a wall secured to a top comprising a funnel so that the step of first locating dirty laundry in the hamper is carried out by funnelling laundry into the hamper. Among the variety of funnel designs that could be used to carry out the function of gravity induced loading, preferably the funnel has an exterior side and an interior side, the funnel being positionable so that when the hamper is in an upright orientation the funnel is in a concave position for gravity-directing laundry on the exterior side of the funnel into the hamper, and when the hamper is in an upside down orientation, the funnel is in a convex position for gravity-directing laundry on the interior side of the funnel out of the hamper. With this approach, the step of removing the dirty laundry from the hamper is carried out by: rotating the hamper from the upright position to the upside down position and funneling the laundry out of the hamper. A third handle (two adjacent the top and one adjacent the bottom) can be used in rotating the hamper.

As stated above, the wall material is an important consideration for the present invention, in view of the functions of the hamper and the environments where it will be used. Where the wall is comprised of a material sufficiently translucent to discretely indicate how full the hamper is with the dirty laundry, the step of transporting can be carried out in response to the indicating of how full the hamper is. Similarly, the method can be carried out with the hamper being comprised of a flaccid wall united with a tension member frame (having sufficient spring to deform in response to the hamper being dropped on a home floor and then to resurrect the hamper to the upright position) so that the step of filling includes deforming the wall, to discretely indicate how full the hamper is. One can perform the step of transporting the dirty laundry in response to the deforming, again without unsightly disclosure of the dirty laundry itself.

The wall material vis a vis the frame can be such that the step of first adjusting is carried out by locating the wall into

6

a faceted configuration, or (alternatively) by locating the wall into a curvalinear configuration. Depending on the approach used for collapsing the hamper, the step of first adjusting can be carried out by locating the bottom into an undeformed (e.g., untwisted) configuration.

As indicated above, it is desirable that the method further comprising the steps as follows: prior to the first transporting, first lifting the hamper by handles secured to the hamper, the first lifting being carried out at the first location; and prior to the second transporting, second lifting the hamper by the handles at the second location.

Phrased differently, the method for using a hamper can comprise the steps of: filling a hamper; and then unfilling the hamper, wherein: the steps of filling and unfilling are carried out with hamper being comprised of at least one wall secured to a top and to a base, the top and the base defining an upright orientation for the hamper and an upside down orientation for the hamper; and the filling is carried out with the hamper in the upright orientation, and the unfilling is carried out with the hamper in the upside down orientation, and wherein the top comprises a funnel having an exterior side and an interior side, the funnel being positionable so that when the hamper is in the upright orientation the funnel is in a concave position so that the filling is carried out by gravity induced funneling from the exterior side of the funnel into the hamper, and when the hamper is in the upside down orientation, the funnel is in a convex position for gravity-induced funneling from the interior side of the funnel out of the hamper.

Preferably, the wall is a multi-color wall for color coordinated location in a bedroom; and the method further comprises the step of: locating the hamper in a bedroom; and wherein the step of filling is carried out at a bedroom location. In this application, the steps of filling and unfilling can be carried out with the hamper having a height in the range of 20 to 26 inches and a top having a width in the range of 16 to 20 inches. The hamper preferably also has a height dimension and a width dimension proportioned such that a ratio of the width dimension to the height dimension is greater than 0.7, and/or with the hamper having a top width in the range of 16 to 20 inches and a height in the range of 20 to 26 inches. The wall can be made sufficiently translucent for discretely indicating how full the hamper is. Thin material is desirable for lightweight transport and deformability. For example, the wall can have a thickness less than 0.004 inch. The wall can be made of a material that is woven and have at least 50 threads per inch, preferably more, and can even be waterproof.

For convenient transport the hamper can have handles adjacent the top, preferably made of a material softer than the frame. Further, the hamper can be comprised of: a fastener for closing the funnel after the filling; and for opening the funnel prior to the unfilling. Having the frame united to the wall by pocketing the frame in the material is a light weight and straightforward feature.

In a more particular embodiment of the method for using a laundry hamper optionally repositionable in an expanded position and a retracted position, the method can comprise the steps of: adjusting the laundry hamper from the retracted position into the expanded position; filling the laundry hamper; and then unfilling the laundry hamper; and then readjusting the laundry hamper from the expanded position to the retracted position. This method can be carried out with the hamper being comprised of a flexible tension member frame and flexible material secured to the frame, such that the laundry hamper: in the expanded position, has a bottom,

5,964,533

7

a wall connected to the bottom, and a top connected to the wall, the top having an opening, laundry hamper having a volume defined by the top, the bottom, and the wall, the top and the bottom defining an upright orientation and an upside down orientation; wherein the tension member induces movement from the retracted position; and wherein the tension member opposes movement from the expanded position.

In such a more particular embodiment, the step of adjusting can be carried out with the flexible tension member including a helical spring portion between the bottom and the top, the spring providing sufficient tension to maintain the hamper in the upright position; and wherein the step of adjusting includes the spring portion inducing the movement from the retracted position. However, as implied above, the method of can alternatively be carried out without the flexible tension member including a helical portion between the bottom and the top. In a species of this approach, the step of adjusting is carried out such that, in the expanded position, the flexible tension member does not extend from one, of the bottom and the top, to an other, of the bottom and the top, and back to the one; but in an alternative species, it does so extend. In the latter case, the laundry hamper can be comprised of at least one other flexible member, each of the flexible tension members formed in a respective loop; and wherein: the step of adjusting is carried out such that in the expanded position each of the loops defines a respective plane; and the step of readjusting is carried out such that, in the retracted position: each of the loops do not define a respective plane and a portion of a loop (a subloop) forms a base.

As to all of the foregoing, the method can be carried out with the top including a funnel having an exterior side and an interior side, the funnel being positionable so that when the hamper is filled in the upright orientation the funnel is in a concave position, and when the hamper is in the upside down orientation, the funnel is in a convex position; and wherein the step of filling is carried out with the hamper in the upright position for gravity induced funneling from the exterior side of the funnel into the hamper; and wherein the step of unfilling is carried out with the hamper in the upside down position for gravity induced funneling from the interior side of the funnel out of the hamper. Additionally, the method can be accomplished so that the step of filling is carried out at a first location with contents resulting in a first weight for the filled hamper; and further comprising the step of: first transporting the hamper and the contents to a second location; and wherein the step of unfilling is carried out at the second location; and further comprising the steps of: refilling the hamper at the second location with essentially the same contents but to produce a second weight less than the first weight; second transporting the hamper and the contents therein to the first location; and second unfilling the hamper at the first location.

The slight difference in the first and second weights is attributable, for example, to the loss of dirt from the laundry. On average, a 25 pound load of dirty laundry can weigh 24 pounds by cleaning, and as a preferred load of laundry for the present invention is 7 pounds (±2 pounds), the weigh loss from cleaning will be about ⅛–¼ pound. Of course variables here include lifestyle (how dirty the laundry is) and what kind of garments are used.

### III. BRIEF DESCRIPTION OF THE DRAWINGS

This invention will be better understood from the following detailed description taken in conjunction with the accompanying figures of the drawing, wherein:

8

FIG. 1 shows a top view of a rectilinear-shaped hamper's top piece just prior to assembly;

FIG. 2 shows a top view of a rectilinear-shaped hamper's bottom piece just prior to assembly;

FIG. 3 shows a rectilinear-shaped hamper's rectangular side panel with strap attached;

FIG. 4 shows a rectilinear-shaped hamper's rectangular side panels sewn together;

FIG. 5 shows a cross-sectional view of two vertical edge corners of a rectilinear-shaped hamper's rectangular side panels that have been sewn together;

FIG. 6 shows an inverted, perspective view of a rectilinear-shaped hamper partially assembled with rectangular side panels and bottom piece sewn together;

FIG. 7 shows a perspective view of a rectilinear-shaped hamper partially assembled with bottom piece (not shown), rectangular side panels, and top piece sewn together;

FIG. 8 shows a perspective view of a rectilinear-shaped hamper with spring wire being inserted into the binding of a rectangular side panel;

FIG. 9 shows a cut-away view of binding on a rectangular side panel of a rectilinear-shaped hamper with spring wire inside and a crimp connector for the spring wire;

FIG. 10 shows a side view of a fully-assembled, rectilinear-shaped hamper in a state of partial collapse into a "book-shaped" object;

FIG. 11 shows a side view of a fully-assembled, rectilinear-shaped hamper in a more advanced state of partial collapse in which the rectangular side panels have been completely folded to lay on top of one another in a series of successive planes;

FIG. 12 shows a top view of a fully-assembled, rectilinear-shaped hamper in a fully collapsed position in which it takes on the appearance of three groups of coils;

FIG. 13 shows a top view of a half circle of fabric to be used for a portion of a cylindrically-shaped hamper's top panel;

FIG. 14 shows a front view of a rectangular panel used for a cylindrically-shaped hamper's body with its short sides sewn together;

FIG. 15 shows a perspective view of the fabric body of a cylindrically-shaped hamper with helically-shaped wide binding strip attached;

FIG. 16 shows a cross-section of the fabric body of a cylindrically-shaped hamper with helically-shaped wide binding strip attached;

FIG. 17 shows a perspective view of the fabric body of a cylindrically-shaped hamper with all helically-shaped wide binding strip and top and bottom wide binding strips attached;

FIG. 18 shows a cross-section of the fabric body of a cylindrically-shaped hamper with top or bottom wide binding strip attached;

FIG. 19 shows a perspective view of an inverted cylindrically-shaped hamper with bottom panel and tying straps attached;

FIG. 20 shows a cross-section of a cylindrically-shaped hamper's bottom panel sewn to the hamper's body;

FIG. 21 shows a perspective view of a cylindrically-shaped hamper inside-out with top panel and tying straps attached;

FIG. 22 shows a cross-section of a cylindrically-shaped hamper's top panel sewn to the hamper's body;

5,964,533

9

FIG. 23 shows a perspective, cut-away view of a cylindrically-shaped hamper with spring wire being fed into binding and hollow tube in place;

FIG. 24 shows a perspective view of a fully-assembled, cylindrically-shaped hamper in its fully-collapsed position with tying straps secured.

FIG. 25 shows representative dimensions for a curvalinear embodiment of the present invention.

FIG. 26a–f shows a series of alternative designs.

FIG. 27 shows step one in a method for using a hamper in accordance with the present invention.

FIG. 28 shows step two in a method for using a hamper in accordance with the present invention.

FIG. 29 shows step three in a method for using a hamper in accordance with the present invention.

FIG. 30 shows step four in a method for using a hamper in accordance with the present invention.

## IV. DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

To make a hamper in accordance with the present invention, many diverse but suitable approaches can be employed. In a broad conception, one can employ container having a wall secured to a top comprising a funnel for funnelling laundry into the hamper. However, several illustrative embodiments provide an opportunity to articulate the invention, in such representatively diverse structural approaches.

### A. Representative Rectilinear Hamper

In the following preferred embodiment the hamper (in an expanded position) has a flexible tension member that does not include a helical portion between the bottom and the top of the hamper. For example, a rectilinear approach can be in the shape of a cube, even though many discrete containers with different numbers of facets or sides can be used. The only limitation on the number of sides used for the hamper lies in how thickly the sides of the hamper stack when the hamper is collapsed, as this thickness limits the user's ability to collapse the hamper into the smallest possible package.

A rectilinear approach can have the laundry hamper comprised of at least one other flexible member, each of the flexible tension members formed in a respective loop so that, when adjusted into the expanded position, the loops are oriented to define a respective plane or facet. The following describes the manufacture and use of a hamper in the shape of a cube.

### 1. Make

In a general embodiment, the hamper is made having at least one wall secured to a top and to a base, the top and the base defining an upright orientation for the hamper and an upside down orientation for the hamper. The top preferably comprises a funnel having an exterior side and an interior side, the funnel being positionable so that when the hamper is in the upright orientation the funnel is in a concave position for gravity-directing material on the exterior side of the funnel into the hamper, and when the hamper is in an upside down orientation, the funnel is in a convex position for gravity-directing material on the interior side of the funnel out of the hamper. In view of household wear and tear, it is useful to have the hamper made with a tension member frame having sufficient spring to deform in response to the hamper being dropped on home a floor and then to resurrect the hamper to the upright position. And if the wall is made of a deformable material, the tension member frame can be secured to the wall to permit retractable collapsing of the hamper from a collapsed position to an

10

expanded position. For light weight convenience, the hamper can have handles adjacent the top and made of a material softer than the frame, and the frame can be secured to the wall by pocketing the frame in the material.

In one configuration alternative to the cube, in the expanded position, the flexible tension member does not extend from one, of the bottom and the top, to an other, of the bottom and the top, and back to the one. In another alternative configuration, in the expanded position, the flexible tension member does extends from one, of the bottom and the top, to an other, of the bottom and the top, and back to the one. For example, where the hamper has a plurality of flexible members, each of the flexible tension members formed in a respective loop, the loops being oriented such that, in the expanded position, each of the loops is defines a respective plane; and in the retracted position: each of the loops does not define a respective plane, the laundry hamper is not in the upright position, the laundry hamper is not in the upside down position, and a portion of a loop forms a base. To further reduce the shelf space that would otherwise be occupied by this configuration, in the retracted position, the loops twist into three subloops.

More particularly, one can make a preferred embodiment as follows.

### 2. Wall or "Body"

The wall or body of the hamper can be formed of a flexible, flaccid, compressible, moderate, or at least foldable material. For example, a light weight woven or non-woven, natural or artificial material may be used for the wall material. The material can, in a preferred example, have a thickness less than 0.004 inch. Where the material is woven, it can have at least 50 threads per inch. A preferred embodiment uses a body material of 72×96 threads per inch of nylon #1901T taffeta, which is a flaccid material having a thickness of about 0.0035 inch.

One approach is to use a translucent material for discretely indicating how full the hamper is. Another is to use a material that is sufficiently deformable when supported by the frame as to be discretely indicative of how full the hamper is. In either case, it is desirable to use a color, and even better to use multi-color, for the wall material so that the hamper is color coordinated for location in a bedroom.

While the principal contemplated use of the hamper design is for laundry, the hamper can be used for other purposes, e.g., for storage and/or transportation of goods or other items. One can even use the present invention for such storage and transportation of perishables, food, beverage, etc., but then the body material chosen should be waterproof to hold ice and water. Alternatively, the body material can be treated with a waterproofing agent.

The body material should be placed on a conventional cutting table. As necessary, the body material is unfolded or spread out upon the cutting table to allow preparation of several panels and pieces of body material out of which the final body of the hamper will be sewn. Four large, rectangular side panels 7 with rounded corners are cut out of the body material. The rectangular side panels 7 may be of any suitable size with the limitation that they be of equal size to one another. Then one square bottom panel 4, preferably with mitered corners, is cut out of the body material. Two large triangular top pieces 2 with three mitered corners each are next cut out of the body material. Eight small triangular top and bottom corner pieces 3 are then cut out of the body material. Finally, narrow binding strips 1 are cut out of the body material for binding edges of the large triangular top pieces, and wide binding strips 6 are cut out of the body material for binding flat spring wire onto four sides of the

5,964,533

11

hamper. Note that other material can be suitable for the tension member function of the spring wire, such as plastic with a memory (e.g., Lexan). When this operation is complete a total of fifteen major panels and pieces plus numerous assorted strips used for binding have been prepared.

The panels and pieces of body material are then sewn together to form the body of the hamper. All sewing operations can utilize polyester thread **5**.

3. Hamper Top

Narrow binding strips **1** are sewn onto each of the long sides of the two large triangular top pieces **2**. The two bound edges of the two large triangular top pieces **2** are placed next to one another and four of the small triangular top and bottom corner pieces **3** are sewn onto the four mitered corners formed by the two large triangular top pieces **2**. When this sewing is complete, the hamper top appears essentially as a square piece of body material having two sides (what will become an interior side and an exterior side) and with extra long, pointed corners and a diagonal slit running across the middle. Note that additional features can be added to the top, such as a fastener such as velcro strips, optionally, for opening and for closing the two pieces **2**. Where the slit is not rigid or very tightly supported, gravity will pull it downward and into a configuration that will operate as a funnel, as discussed in greater detail hereafter.

4. Hamper Bottom

The remaining four small triangular top and bottom corner pieces **3** are sewn onto the square bottom panel **4**. Only the shortest leg of each of the small triangular top and bottom corner pieces **3** is sewn to each of the mitered corners on the square bottom panel **4**. When this sewing has been completed, the hamper bottom appears as a square with extra long corners and is a retractably deformable bottom.

5. Hamper Sides

To illustrate how to make a wall is comprised of facets, provide each of the four rectangular side panels **7** with wide binding strips **6** attached by sewing to all of its edges. The effect of this sewing is to create an approximately ½" wide enclosure or pocket running around the entire edge of each rectangular side panel **7**, into which will be fed flat spring wire **8** at the end of all sewing operations. To accomplish this enclosure effect, the wide binding strips **6** are folded in half as they are sewed onto the edges of the rectangular side panels **7**. The sewing of a wide binding strip **6** onto a rectangular side panel **7** commences at a point just off-center of the bottom edge of the rectangular side panel **7**, and continues all around the circumference of the rectangular side panel **7**. When the entire edge has neared completion, the last 2" of the wide binding strip **6** is left unsewn and unattached, with the last ½" of the wide binding strip **6** being tacked down. An opening is thereby created in the wide binding strip **6** into which the flat spring wire **8** may be inserted at the appropriate time. This sewing operation is to be repeated for each of the other three rectangular side panels **7**. If desired, upon two of the rectangular side panels **7** at the center of the top edge a loop **90** of material (which can be woven or non-woven, natural or artificial) can be sewn to the rectangular side panel **7** as the wide binding strip **6** is being attached. These loops **90**, secured adjacent the top, can then be used later as handles for the hamper.

6. Joining the Hamper Sides

The long, vertical edges **100** of the rectangular side panels **7** are sewn together to form the hamper's sides. At the end of this stage, the hamper will form a box-like structure with no top or bottom. Two rectangular side panels **7** are placed next to each other such that the wide binding strips **6** of the panels **7** overlap. The edges of the rectangular side

12

panels **7** are sewn together, with care taken to ensure that the sewing is accomplished on the outside of the stitching used to hold the wide binding strips **6** to the panels **7**. In this fashion, the panels **7** are joined together with the wide binding strips **6** forming a channel for insertion of the flat spring wire **8** later in the process. Next, a third rectangular panel is taken and joined to the edge of one of the joined panels **7** in the same fashion that the first two panels **7** were joined. Finally, the final panel **7** is joined to both the third and the first rectangular side panels **7**, again using the same procedure.

7. Attaching the Hamper Bottom

At this point the hamper bottom consists of the square bottom panel **4** with four small triangular top and bottom corner pieces **3** attached. The edge of the hamper bottom **4** & **3** is aligned to overlap the wide binding strips **6** and the bottom edges of the rectangular body panels **7** forming the hamper sides. This area of overlapping material is then sewn to create a totally enclosed hamper bottom **4** & **3**.

8. Attaching the Hamper Top

The hamper top now consists of the two large triangular top pieces **2** and four small triangular top and bottom corner pieces **3**. The edge of the hamper top **2** & **3** is aligned to overlap the wide binding strips **6** and the top edges of the rectangular body panels **7** forming the hamper sides. The area of overlapping material is then sewn in order to create a totally enclosed space within the hamper, accessible only through the diagonal slit **11** in the hamper top **2** & **3**. The slit **11** forms a funnel under the influence of gravity. As suggested above, the two large triangular top pieces **2** have an exterior side and an interior side, with respect to the hamper. The slit **11** or funnel is positionable so that when the hamper is in an upright orientation the funnel is in a concave position for gravity-directing material on the exterior side of the funnel into the hamper, and when the hamper is in an upside down orientation, the funnel is in a convex position for gravity-directing material on the interior side of the funnel out of the hamper.

9. Exterior Finishing

Narrow binding strips **1** are sewn onto all sewn edges on the hamper, including edges on the rectangular body panels **7**, the hamper top **2** & **3**, and the hamper bottom **4** & **3**. After completion of this step, the hamper is turned inside-out to ensure that all "rough" sewing appears only on the inside of the hamper and only finished sewing appears on the outside.

10. Frame

For a tension member frame secured to the wall or body, to induce movement of the hamper from a collapsed position, and to oppose movement of the hamper from an expanded position, wire can be used. The wire used should be of a type sufficiently light-weight to allow the hamper to collapse fully through bending of the wire and be self-supporting when erect, and yet have sufficient strength to uncoil automatically when twisted and bear the weight of the hamper. A flat spring wire **8** can be used. If flat spring wire is used, it can measure 0.032" thick and be 0.125" wide.

The flat spring wire **8**, or equivalent tension member, is inserted into the body material of the hamper in the following manner. First, one end of the flat spring wire **8** is pushed into the opening in the wide binding strip **6** of any of the rectangular side panels **7**. The wire should be fed through completely around the circuit of the wide binding strip **6** surrounding the rectangular side panel **7**, until the free end reappears at the point of original insertion. The flat spring wire **8** can then be cut, taking care to leave sufficient wire to overlap the free end of the wire by about 1½". The two ends of the flat spring wire **8** are thus overlapped, and are crimped

5,964,533

13

together with a metal crimping connector **12**. A continuous loop of spring wire is therefore formed surrounding the rectangular side panel **7** of the hamper within the wide binding strip **6**. This procedure is repeated four times, once for each of the rectangular side panels **7**. Manufacture of the hamper will then be complete. The hamper can then be folded into a collapsed or retracted position for packaging and sale.

11. Final Product

A hamper made in accordance with the above can have a height dimension and a width dimension proportioned such that a ratio of the height dimension to the width dimension is greater than 0.7. The hamper can have a height in the range of 20 to 26 inches and a top having a width in the range of 18 to 20 inches.

B. Use

Use of the hamper made in accordance with the above can include expansion of the hamper, collapsing of the hamper, the placing of goods within the hamper, the removal of goods from within the hamper, and the transportation of the hamper in either its erect or collapsed state. Funneling and reverse funneling are the preferred techniques for certain applications.

1. Erection of the Hamper

A user receives the retractably collapsible hamper (when new) in its collapsed position, packaged for sale to minimize shelf space, as well as for customer convenience. Upon removing the hamper from the packaging, the user will note that it appears as a stack of three groups of several circular coils of wire within fabric (FIG. **12**). The user erects the hamper by first adjusting hamper from a collapsed position to an expanded position, for example beginning by unfolding the hamper. The user grasps the two outside groups of coils and gently pulls them apart with a simultaneous twisting motion. A flat, roughly rectangular shape composed of two main layers is thereby created (FIG. **11**). The user now examines the shape to locate an opening between the layers. The user pulls the edges of the layers at the opening gently apart, and the shape opens up like a book (FIG. **10**). Complete opening of the now book-like shape is prevented by the presence of two, triangular-shaped pieces of fabric holding the "covers" of the book-like shape together.

As the hamper is comprised of a tension member frame, this step of first adjusting is carried out so that the tension member induces adjustment from the collapsed position. For example, the user reaches into the inside seam of the covers of the book-like shape to the point where the two inside edges of the covers are joined together. The user can then feel two wires within the material of the seam of the shape, one towards the inside surface of the shape and one toward the outside surface. The user gently pulls these two wires apart, exploding the inside seam of the inside surface of the shape outward. When the corners of the shape have been evened by the user pulling them outward, the wall is located into a faceted configuration, and the hamper assumes a full, three-dimensional roughly cubic shape and assembly is complete.

2. Filling the Hamper

The user can fill the hamper, for example, by (first) locating dirty laundry in the hamper at a first location, such as a bedroom. It is preferable for this application for the wall to be color coordinated for location in a bedroom, it can be even better, to have a multi-color wall for this purpose of locating the hamper in a bedroom. Accordingly, the step of filling can be carried out at a bedroom location. Other locations, of course would suffice for filling the hamper.

While the user can place the laundry or other items within the hamper by means of grasping them and passing them

14

through the diagonal slit **11** in the hamper top **2** & **3**, there is a better way. By using a the hamper featuring a wall secured to a top comprising a funnel, the step of (first) locating dirty laundry in the hamper can be carried out by funneling laundry into the hamper. In either case, the items come to rest against the hamper bottom **4** & **3** and/or rectangular side panels **7** and/or other items already within the hamper, and are confined within the hamper.

If the hamper is being used for holding perishable goods such as a member from the group consisting essentially of a food, a beverage, and a combination of food and beverage, and the user wishes the goods to remain cold, then the user may wish to pass or funnel frozen and/or liquid water through the diagonal slit **11** in the hamper top **2** & **3** prior to or after locating the goods within the hamper.

3. Transporting the Hamper and Contents

In the case of laundry, by virtue of the handles and flexible materials, the hamper is convenient for (first) transporting the hamper and the dirty laundry to a second location, such as a laundromat, dry cleaner, or other laundry facility. The notion of transport is premised on an idea of filling the hamper in a different room than where the contents are removed, e.g., where the laundry is cleaned. But the hamper can, of course, be used without transport-accordingly, this step is viewed as a desirable option for certain uses.

If the hamper wall is sufficiently translucent to discretely indicating how full the hamper is with the dirty laundry, the step of transporting is carried out in response to the indicating of how full the hamper is. Alternatively, or in addition, if the hamper wall is a flaccid wall, though united with a tension member frame, the wall can be sufficiently deformable to discretely indicate how full the hamper is with the dirty laundry, such that the step of transporting can be carried out in response to the indicating of how full the hamper is.

Note: Prior to the (first) transporting, first lift the hamper by handles secured to the hamper at the first location.

4. Unfilling the Hamper

Removing the dirty laundry or other contents from the hamper, as mentioned above, is preferably carried out at the second location. Removal by the user of goods from within the hamper consists of completion of the above steps in reverse. In addition, if the goods included foods or beverages that were stored with the assistance of water and/or ice the user may wish to remove the water and/or ice by inverting the hamper and allowing the water and/or ice to pass out through the diagonal slit **11** by force of gravity. In a use pertaining to laundry, after the unfilling step, the dirty laundry is cleaned to produce clean laundry, for example by washing to remove dirt and oil.

Unfilling the hamper is more interesting in the case of the hamper featuring the funnel having an exterior side and an interior side, the funnel being positionable so that when the hamper is in an upright orientation the funnel is in a concave position for gravity-directing laundry on the exterior side of the funnel into the hamper, and when the hamper is in an upside down orientation, the funnel is in a convex position for gravity-directing laundry on the interior side of the funnel out of the hamper. The step of removing the dirty laundry from the hamper can be carried out by rotating the hamper from the upright position to the upside down position, and funneling the laundry out of the hamper.

5. Refilling the Hamper

In some applications of the present invention, it is optionally desirable to refill the hamper at the second location, e.g., the laundry facility. For example, after the clothing has been washed to remove the dirt and oil, the laundry can be folded

5,964,533

15

(as in folding towels and sheets) or bound up (as in joining socks), and then neatly relocated in the hamper. Again, the filling can be carried out by means of the funnelling method. This is particularly advantageous where the clean laundry is balled up socks and the like.

Interestingly, in the laundry application, the hamper is refilled with essentially the same contents as when the hamper was first filled, except that the dirt and oil, etc. has been removed by the washing. Thus, the first filled weight for the hamper and dirty laundry is believed to be slightly greater than the weight of the cleaned laundry (all things considered, particularly humidity). Further, it is interesting that the dirty laundry first funneled into the hamper (and thus uncompressed) seems to occupy more space than folded and/or bundled laundry. Thus, when the hamper is refilled with essentially the same contents as when it was first filled, except that contents have less weight due to the loss of dirt, and are arraigned to occupy less space, if the contents are folded or bundled.

6. Second Transporting of the Hamper

Optionally, the hamper may be transported in either its expanded or collapsed positions, and in its expanded position, the hamper may be transported with items inside or not. For a second transporting the hamper (refilled) back to the first location, this step can represent returning from the laundry facility with the clean laundry in the hamper to the bedroom from whence the method began. If the laundry was for dry cleaning or more particularly for pressing, refilling the hamper would risk wrinkling that which was just pressed. Thus, it is convenient to optionally conduct the second transporting step with the laundry not within the hamper.

If transported when expanded, the hamper may either be grasped and lifted by the straps 9 or may simply be grasped about the body, under the hamper bottom 4 & 3, by the hamper top 2 & 3, or by any combination thereof, and lifted and carried. If transported when collapsed, the entire hamper can simply be grasped by one hand and carried away.

Note again: Prior to the (second) transporting, lift the hamper by the handles at the second location.

7. Second Unfilling of the Hamper

For removing the cleaned laundry from the hamper at the first location, one can manually reach in and withdraw the items, or in the appropriate circumstance, a reverse funnel-ing method can be employed. Recall the embodiment in which the funnel has an exterior side and an interior side, the funnel being positionable so that when the hamper is in an upright orientation the funnel is in a concave position for gravity-directing laundry on the exterior side of the funnel into the hamper, and when the hamper is in an upside down orientation, the funnel is in a convex position for gravity-directing laundry on the interior side of the funnel out of the hamper. In this embodiment, the step of a second removing of the laundry from the hamper is carried out by rotating the hamper from the upright position to the upside down posi-tion and funneling the laundry out of the hamper. While this technique is not particularly suitable where it would unfold folded items, it is quite suitable for removing such items as socks.

8. Collapsing the Hamper

The hamper should be empty in order to fully collapse or perform a second adjusting to collapse the hamper from the expanded position to the retracted position. Otherwise, the collapsing will trap contents therein, in the nature of a purse.

The user grasps two diagonally-opposite corners of the hamper and through application of pressure brings them together, repeating this operation (or performing it

16

simultaneously) for the top 2 & 3 and bottom 4 & 3 panels, even though the tension member opposes movement from the expanded position. The hamper now takes on the appear-ance of the book-shaped structure (FIG. 10) referred to earlier. The user then folds the "covers" of this book-shaped structure in order to create a flat, roughly rectangular shape composed of two main layers (this has the effect of laying all four rectangular side panels 7 of the hamper on top of one another (FIG. 11)). The user then grasps the top edges of the rectangular side panels 7 and the bottom edges, bringing them together by application of compressive pressure while simultaneously twisting them in opposite directions. When the top and bottom edges have been brought together in this fashion, the hamper now presents an appearance of three groups of several coils folded neatly on top of one another (FIG. 12).

B. Representative Curvalinear-walled Hamper

In a second representative configuration, the hamper used is formed with a curvalinear wall, e.g., in the shape of a cylinder. For the sake of brevity, discussion here will focus on curvalinear features-recognizing the inherent features of the invention as separately applied to both a rectilinear embodiment and a curvalinear embodiment, and the manner of their use.

1. Make

Here, as with the above, there generally is a frame comprised of a flexible tension member and flexible material secured to the frame to form a laundry hamper having an expanded position and a retracted position. The laundry hamper is optionally repositionable to one of the positions. The laundry hamper (in the expanded position) has a bottom, a wall connected to the bottom, and a top connected to the wall, the top having an opening. The laundry hamper has a volume defined by the top, the bottom, and the wall, the top and the bottom defining an upright orientation and an upside down orientation. A tension member frame united with the wall induces movement from the retracted position, and the tension member opposes movement from the expanded position.

As above too, the top preferably comprises a funnel having an exterior side and an interior side. The funnel is positionable so that when the hamper is in the upright orientation the funnel is in a concave position for gravity-directing laundry on the exterior side of the funnel into the hamper, and when the hamper is in the upside down orientation, the funnel is in a convex position for gravity-directing laundry on the interior side of the funnel out of the hamper.

Unique in this species of a curvalinear embodiment is that in the expanded position, the flexible tension member can include a helical portion between the bottom and the top.

a. Body

The body of the hamper can be formed of the material discussed above with respect to rectilinear embodiment. The body material is laid upon a conventional cutting table to facilitate the cutting of various pieces from which the hamper's body will formed. One rectangular panel 30 is cut out to form the main body of the hamper. In a preferred embodiment, the rectangular panel 30 cut is 22" wide (the width of the rectangular panel 7 ultimately determines the height of the hamper). Several narrow binding strips 2 are cut out in numbers sufficient for binding the straight edges of the hamper's lid, and for making tying straps 10 for the hamper. Several wide binding strips 4 are cut out in numbers sufficient for binding spring wire in a helical pattern around the bottom, body, and top of the hamper. Once these pieces have been cut out of the body material they may be sewn together as follows using polyester thread 5.

5,964,533

17

The rectangular panel is used to form the body of the hamper by sewing together its two shorter sides **6**, thereby forming a round cylinder with neither a top nor a bottom. If the rectangular panel used is 22" wide, the resulting open cylinder will be 22" high. This cylinder is then turned inside-out, and a wide binding strip **4** is sewn onto the outside of the hamper body in a helical pattern by first being sewn onto the cylinder at its bottom, then making two complete, evenly-spaced ascending revolutions around the cylinder, and then stopping at the top of the cylinder at a point almost directly above the point at which the wide binding strip **4** started at the bottom of the cylinder. Care must be taken to ensure that the wide binding strip **4** is not fully stitched, and instead about 2½" at both ends are left unstitched to facilitate insertion of spring wire **8** later in the process.

Separate wide binding strips **4** are also attached around the circumferences of the top and bottom of the cylinder. The outside surfaces of these wide binding strips **4** should be approximately 1" wide after fastening to the cylinder. First, the rough edges of the wide binding strips **4** are folded under and sewn approximately 1/16" in from the new, finished edge of the wide binding strips **4**. The wide binding strips **4** are left unsewn on the ends to create a space within that is approximately 7/8" wide for insertion of spring wire **8** later in the process. The spaces thus created for insertion of spring wire **8** in the wide binding strips **4** located at the circumferences of the top and bottom of the cylinder should be adjacent to the insertion points left open for spring wire **8** in the helical wide binding strip **4**.

At this time, the fabric cylinder is turned inside-out again so that the wide binding strips **4** appear on the inside of the cylinder.

b. Hamper Top

Two half circles **1** are cut out of the body material and will serve for the hamper's top panel, with an opening between the two half circles **1** forming the funnel configuration above. Further, a fastener for closing the funnel can be used as described above too. Note that the funnel need not be round, and the mouth can be small, large or very large—the key issue is the funneling function. There should at least be some gravity inducement to aid the filling of the container.

The circular edges of the half circles **1** cut out of the body material are aligned with the top edges of the cylinder and wide binding strips **4** attached thereto. These edges are then sewn together. During this process, at least one and preferably two handles may be attached adjacent to the top to facilitate carrying of the hamper. Another handle can be attached adjacent to the bottom for use in rotating the hamper to disgorge its contents. If handles are to be used, one method is to attach a short polypropylene strap loop **12** at each end of the slit **11** formed by the gap between the straight edges of the half circles **1**. When this step has been completed, the only opening into the cylinder will be through the slit **11** in the hamper top.

Narrow binding strips **2** are sewn onto the straight edges of the half circles **1** to provide a cosmetic finish for the edges.

c. Hamper Bottom

A single circle is cut out from the body material to serve as the hamper's bottom panel **9**. The edge of the round bottom panel **9** is aligned with the bottom edge of the cylinder and the edge of the wide binding strip **4**. The edge of the round bottom panel **9** is then sewn to the edge of the cylinder and the wide binding strip **4** completely around their circumferences. During this process, two 24" tying straps **10** are sewn into the round bottom panel **9** seam

18

opposite one another. 12" of each tying strap **10** is pulled through into the inside of the cylinder before sewing, so that when finally fastened each tying strap **10** has 12" within the cylinder and 12" protruding outside of the cylinder. These tying straps **10** ultimately will allow users to fasten the cylinder hamper in its collapsed position.

d. Frame

A spring wire or more can be used to provide structural support for the hamper. One method is to use round, pre-formed aluminum spring wire **8** measuring approximately 0.175" in diameter. The spring wire **8** is first inserted into the space or pocket left in the wide binding strip **4** at the top of the cylinder. The spring wire **8** is fed into this wide binding strip **4**, completing a circumference of the top of the cylinder. As the free end spring wire **8** comes back around to the point of original insertion, the spring is led out of the wide binding strip **4** in the top of the cylinder and directed into the space left in the helical wide binding strip **4** that wraps around the cylinder. However, before the free end of the spring wire **8** enters the helical wide binding strip **4**, a 4" long piece of flexible hose **13** is slipped over it. The flexible hose **13** should have an internal diameter sufficient to allow two pieces of spring wire **8** to pass. In this manner, the flexible hose **13** is used to secure the top free end of the spring wire **8** after it is cut from the spool of spring wire at the end of this pocketing procedure The spring wire **8** is fed throughout the length of the helical wide binding strip **4** until it appears at the opening in the end of the helical wide binding strip **4** at the bottom of the cylinder. A second 4" long piece of flexible hose **13** is now slipped over the other free end of the spring wire **8** protruding from the bottom of the cylinder ultimately to join it to the helical portion, in the above-described manner. After this operation, the free end of the spring wire **8** is fed into the space in the wide binding strip **4** around the bottom of the cylinder. The spring wire **8** is fed throughout the wide binding strip **4**, and as the free end comes around to the point of original insertion it is again passed through the flexible hose **13** at the bottom of the cylinder through which it passed earlier. The free end of the spring wire is pushed through further so that it overlaps its earlier length to a distance of about 12". The flexible hose **13** can then slide down both loops of spring wire (the original and the now overlapping) in order to hold the free end of the spring wire **8** tight against the main body of the wire. At the top of the cylinder, the spring wire **8** is cut from the spool, creating a free end of spring wire now also at the top of the cylinder. The flexible hose **13** positioned on the spring wire **8** at the top of the cylinder earlier can now be used to secure the free end of the spring wire just as at the bottom of the cylinder. All of the openings in the helical wide binding strip **4** and top and bottom wide binding strips **4** are then hand-stitched closed.

e. Finishing

The hamper's stitching is cosmetically finished by sewing narrow binding strips **2** to all raw edges on the cylinder, the hamper top, and the hamper bottom **9** where they are joined. After this finishing work, the cylinder is again turned inside out to place all rough sewing on the inside of the hamper and all finished sewing on the outside of the hamper.

The cylinder hamper is complete and can be compressed for packaging and shipment.

2. Use

Generally, the method of use comprises the steps of: filling a hamper; and then unfilling the hamper wherein: the steps of filling and unfilling are carried out with hamper being comprised of at least one wall secured to a top and to a base, the top and the base defining an upright orientation

5,964,533

19

for the hamper and an upside down orientation for the hamper; and the filling is carried out with the hamper in the upright orientation, and the unfilling is carried out with the hamper in the upside down position, and wherein the top comprises a funnel united with the top and having an exterior side and an interior side, the funnel being positionable so that when the hamper is in the upright orientation the funnel is in a concave position so that the filling is carried out by gravity induced funneling from the exterior side of the funnel into the hamper, and when the hamper is in the upside down orientation, the funnel is in a convex position for gravity induced funneling from the interior side of the funnel out of the hamper.

Use of the hamper can also feature expanding the hamper prior to placing contents within the hamper, and later removing the contents. Preferably the filling is carried out at a first location, followed by transporting the hamper and the contents therein to a second location, removing the contents from within the hamper at the second location, restoring essentially the same contents back in the hamper, transporting the hamper and the contents back to the first location, and then re-removing the contents from the container. The container can be stored thereafter in either its erect or collapsed state.

Further, a fastener can be used for closing the funnel after the filling(s) and thereafter opening the funnel prior to the unfilling(s).

a. Erection of the Hamper

A user receives the hamper (when new) in its collapsed position, and must therefore first erect it. This is accomplished quite simply when the user unties the tying straps **10** or otherwise allows the spring to pop up the hamper. The hamper will erect itself as the spring wire decompresses, thereby locating the wall into a curvalinear configuration.

b. Collapsing the Hamper

Where the configuration is helical as above, the base can be deformable or not. A solid base can be used to add weight to help maintain the hamper in an upright position, though for most applications, it is better to use a lightweight and flaccid or deformable bottom. Note that use of a deformable bottom permits relocating the bottom into an undeformed configuration in the manner of the rectilinear configuration that can collapse its base into a subloop. That is, the step of readjusting is carried out such that, in the retracted position: each of the loops do not define a respective plane and a portion of a loop forms a "base."

Compare **24** with **25** for a comparison of the collapsed and the expanded positions of the hamper.

C. Still Other Embodiments

FIG. **26** shows a series of other representative, alternative designs. FIGS. **26**a-b illustrate that the helical spring portion between the bottom and the top, need not be cylindrical. An outward bulging wall can produce spherical shape in FIG. **26**a, which contrasts with the inward bulging wall illustrated in FIG. **26**b. In both of these cases, there is a helical portion between the bottom and the top. A generally cone-shaped is a similarly viable approach (configuration).

But consider FIGS. **26**c-d, in which there is a tension member that is not helical. Instead, C-shaped tension members point inward in FIG. **26**c, and outward in FIG. **26**d. Note that the C-shaped tension members need not be completely pocketed particularly when outward pointing, or otherwise if the wall is secured along the height of the hamper, such wall can be of a flexible material so as not to interfere with the hamper can be collapsing. In these designs of **26**c-d, the in the expanded position, the flexible tension member does not extend from one, of the bottom and the top,

20

to an other, of the bottom and the top, and back to the one. A variation (not shown) on this theme is to have one member have a loop for the base and then extend upwards to unite with a loop for the top. The loop for the top is part of a member that extends down to unite with the bottom loop. Both members are the tension members, such that in the expanded position, the wall location is defined by the loops and the members.

FIG. **26**e represents a "Chinese Lantern" approach, recognizable by an accordion-like ribbing. In this case, there can be a few reticulated tension members or many little tension members, at least one between each rib.

FIG. **26**f illustrates a design in which a flexible tension member extends from one, of the bottom and the top, to an other, of the bottom and the top, and back to the one.

With regard to such alternative structures, consider the following which like the preceeding referenced patents, are incorporated by reference herein: U.S. Pat. No. 5,467,794, titled "Collapsible Shade Structure," listing Yu Zheng as the inventor; U.S. Pat. No. 5,439,017, titled "Collapsible Frame," listing Douglas M. Brown as the inventor; U.S. Pat. No. 5,360,028, titled "Self-erecting Tent on Folding Base," listing Mark S. Jasin as the inventor; U.S. Pat. No. 5,337, 772, titled "Self-folding Shelter," listing Elie E. Habchi as the inventor; U.S. Pat. No. 5,301,705, titled "Collapsible Shade Structure," listing Yu Zheng as the inventor; U.S. Pat. No. 5,137,044, titled "Collapsible Tend Structure," listing David S. Brady as the inventor; and U.S. Pat. No. 5,038,812, titled "Quickly Erectable Quickly Collapsible, Self-supporting Portable Structure," Lowell R. Norman as the inventor; U.S. Pat. No. 4,858,634, titled "Self Erecting Structure," listing Eddie S. McLeese as the inventor; U.S. Pat. No. 3,727,786, titled "Knock Down Hamper," listing Anthony O. Fausel as the inventor; and the patents of Steven A. Fausel: U.S. Des. Pat. No. 274,662, titled "Hamper;" U.S. Pat. No. 5,474,196, titled "Ready-to-assemble Hamper." In any of these cases, as above, the top should be made instead to conform with the dictates of the present invention, including that the top comprises a funnel having an exterior side and an interior side, the funnel being positionable so that when the hamper is in the upright orientation the funnel is in a concave position for gravity-directing laundry on the exterior side of the funnel into the hamper, and when the hamper is in the upside down orientation, the funnel is in a convex position for gravity-directing laundry on the interior side of the funnel out of the hamper.

In view of the above, it is to be understood that various different modifications are possible and are within the true spirit of the invention, the scope of which is to be determined with reference to the claims set forth below. There is no intention, therefore, to limit the invention to the exact disclosure presented herein as a teaching of an embodiment of the invention.

I claim:

1. An apparatus comprising:

a frame comprised of a plurality of flexible tension members each oriented in a loop;

a plurality of walls each coupled to one of said plurality of flexible tension members;

a bottom coupled to each of said plurality of walls so that a container is formed by a combination of said plurality of walls and said bottom; and

a top coupled to each of said plurality of walls wherein said top has an opening therein for receiving articles.

5,964,533

**21**

**2**. A hamper comprising:

four translucent flexible panels arranged in a substantially rectangular configuration;

four flexible tension loops;

each of the panels is coupled to and substantially encircled by one of the flexible tension loops;

a rectangularly shaped flexible bottom coupled to each of the panels; and

a first flexible handle coupled to one of the panels and a second flexible handle coupled to another of the panels, so that, the handles are on non-adjacent sides of the substantially rectangular configuration of panels.

**22**

**3**. A hamper of claim **2** where each of the four panels is substantially equal in size and shape and the rectangular configuration of panels is a square configuration.

**4**. A hamper of claim **3** where the flexible tension loop is a wire.

**5**. A hamper of claim **4** where the wire is a spring wire.

**6**. A hamper of claim **5** where the spring wire is a flat spring wire.

**7**. A hamper of claim **3** where the flexible tension loop is a plastic material which exhibits a memory characteristic.

\*    \*    \*    \*    \*

<u>ASSIGNMENT AGREEMENT</u>

LaMont Limited, of 1530 North Bluff Road, Box 399, Burlington, Iowa 52601, a corporation of the State of Iowa, being the lawful owner of U.S. Patent No. 5,964,533 entitled Hamper Apparatus and Methods issued on 12 October 1999;

In consideration of Twenty Thousand Dollars ($20,000.00) and other good and valuable consideration, receipt of which is hereby acknowledged;

Hereby sells, assigns, and transfers to Bajer Design & Marketing, Inc., of W229 N1687 Westwood Drive, Unit F, Waukesha, Wisconsin, 53186, a corporation of the State of Wisconsin, its successors and assigns, the entire right, title and interest in and to the patent, including any reissues or extensions, as well as any continuations, divisions, or substitute U.S. patent applications based on said patent that are issued, filled or to be filled, and including all rights to damages and other remedies for past infringement of said patent(s).

Assignor warrants that it is the sole owner of all rights referred to in this agreement and has secured them from any and all parties that have claimed, or may claim, or that might claim such rights by, through, or under said Assignor. Assignor warrants that it has not granted any license agreements, covenants not to sue, or indemnification agreements under said patent.

Assignee hereby grants to Assignor an irrevocable, perpetual, non-exclusive, royalty-free right to make, have made, use, offer for sale and sell throughout the United States, its territories and possessions, any and all products covered by said patent. Assignor's rights in said patent created herein shall not be assignable or transferable by operation of law or otherwise.

This Assignment, including the terms and conditions contained within this Assignment, represents the complete and total agreement between the parties with regard to the assignment and licensing of said patent. Any and all previous discussions or understandings with regard to said patent, whether written or oral, are of no effect. This Assignment is to be interpreted according to the laws of the State of Wisconsin.

The undersigned, Keith D. Garwood, declares: that he is the President of assignor corporation and is authorized to execute this Assignment on behalf of said corporation.

Witness the hand and seal of said Assignor this ___6th___ day of ___February___, 2001.

LaMont Limited

By: _Keith D. Garwood_____
      Keith D. Garwood
      President

STATE OF ___IOWA_____ )
                                                     ) SS
COUNTY OF ___DES MOINES___ )

      Personally came before me this _6th_ day of ___February___, 2001, the above named Keith D. Garwood, the President of LaMont Limited, to me known to be the person who executed the foregoing Assignment, and acknowledged that he executed the foregoing Assignment as such officer as the free act and deed of said corporation, and by its authority.

                                                    _Paul J. Hunt_____

[SEAL] Notary Public                     My Commission expires: _7-16-2001_

                    CAROL J. HIRSCH
                    MY COMMISSION EXPIRES
                    7-16-2001

**EXHIBIT 2**

## POWER OF ATTORNEY

Assignee hereby appoints Attorneys Daniel D. Ryan, Reg. No. 29,243; Joseph A. Kromholz, Reg. No. 34,204; John M. Manion, Reg. No. 38,957; Allan O. Maki, Reg. No. 20,623; Patricia Jones, Reg. No. 46,318; Laura A. Dable, Reg. No. 46,436; and Daniel R. Johnson, Reg. No. 46,204; RYAN KROMHOLZ & MANION, S.C., P. O. Box 26618, Milwaukee, Wisconsin 53226, telephone (262) 783-1300, members of the Bar of the State of Wisconsin, as its domestic representatives and attorneys until this appointment is cancelled or replaced, to prosecute this application to register, to transact all business in the Patent and Trademark Office in connection therewith before and after registration, to receive certificates of registration and renewal, and to receive service of process, and directs that all communications in this application be addressed to said attorneys.

## ACCEPTANCE

This assignment is hereby accepted and I appoint the above attorneys to act in each said matter. The undersigned, Michael S. Kellogg, declares: that he is the President of assignee corporation and is authorized to execute this Acceptance and Power of Attorney on behalf of said corporation.

Bajer Design & Marketing, Inc.

By: _Michael Kellogg_ . Dated: 2/1 _____, 2001.
Michael S. Kellogg
President

STATE OF Wisconsin )
                    ) SS
COUNTY OF Waukesha )

Personally came before me this 1st day of February 2001, the above named Michael S. Kellogg, the President of Bajer Design & Marketing, Inc., to me known to be the person who executed the foregoing instrument, and acknowledged that he executed the foregoing instrument as such officer as the free act and deed of said corporation, and by its authority.

Notary Public
My Commission expires: is permanent

[SEAL]

JOHN M. MANION
NOTARY PUBLIC
STATE OF WISCONSIN

08CV2296     TG
JUDGE COAR    Case 1:08-cv-02296    Document 1-4    Filed 04/09/2008    Page 1 of 20
MAGISTRATE JUDGE DENLOW



US00RE37924E

(19) **United States**

(12) **Reissued Patent**      (10) Patent Number:    **US RE37,924 E**

Kellogg et al.      (45) Date of Reissued Patent:    **\*Dec. 10, 2002**

---

(54) **COLLAPSIBLE CONTAINER AND METHOD OF MAKING AND USING SAME**

(75) Inventors: **Michael S. Kellogg**, Oconomowoc, WI (US); **Dean B. Krotts**, Milwaukee, WI (US)

(73) Assignee: **Bajer Design & Marketing, Inc.**, Pewaukee, WI (US)

(\*) Notice: This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/644,894**

(22) Filed: **Aug. 23, 2000**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **5,971,188**
     Issued: **Oct. 26, 1999**
     Appl. No.: **09/108,521**
     Filed: **Jul. 1, 1998**

(51) Int. Cl.[7] ................................................ **A45C 7/00**

(52) U.S. Cl. ........................ **220/9.2**; 190/126; 190/127; 383/12; 383/33; 383/104; 135/126

(58) **Field of Search** ................................ 135/126, 125; 220/9.2, 9.3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 177,749 A | 3/1876 | Redden |
| 216,227 A | 6/1879 | Sedgwick |
| 217,362 A | 7/1879 | Gardner |
| 218,277 A | 8/1879 | Kilham |
| 251,325 A | 12/1881 | Walters |
| 338,892 A | 3/1886 | Walker |
| 344,340 A | 6/1886 | Barrow |
| 356,301 A | 1/1887 | Belknap |
| 414,622 A | 11/1889 | Willits |
| 481,957 A | 9/1892 | Klank |
| 665,942 A | 1/1901 | Tabler |
| 929,430 A | 7/1909 | Hill |
| 945,918 A | 1/1910 | Crawford |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 2015649 | 2/1971 |
| DE | 41 14 916 | 11/1991 |
| FR | 589062 | 5/1925 |
| FR | 1380728 | 10/1964 |
| FR | 2635136 | 2/1990 |
| GB | 1367 | 5/1971 |
| JP | 6-42227 | 2/1994 |

*Primary Examiner*—Stephen P. Garbe

(74) *Attorney, Agent, or Firm*—Ryan Kromholz & Manion, S.C.

(57) **ABSTRACT**

A collapsible container having a plurality of side panels and a floor panel forming an enclosure having an open top. Each side panel comprises a flexible continuous loop frame, a web of material, and an edging material. The edging envelops the frame and is coupled to the periphery of the web. One or more handles may be attached to the container or formed within one or more of the side panels. A method of making and collapsing the container is also disclosed.

**24 Claims, 13 Drawing Sheets**



10

**EXHIBIT 3**

## US RE37,924 E

Page 2

### U.S. PATENT DOCUMENTS

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 975,745 | A | 11/1910 | Bower | 3,502,091 | A | 3/1970 | Corbin |
| 1,087,702 | A | 2/1914 | Van Patten | 3,583,748 | A | 6/1971 | Arndt |
| 1,135,892 | A | 4/1915 | Grosenbeck | 3,603,367 | A | 9/1971 | Lehrman |
| 1,144,643 | A | 6/1915 | Elkins | 3,661,326 | A | 5/1972 | Wilson |
| 1,155,475 | A | 10/1915 | Fay | 3,675,667 | A | 7/1972 | Miller |
| 1,180,574 | A | 4/1916 | Despot | 3,675,981 | A | 7/1972 | Mallander |
| 1,181,829 | A | 5/1916 | Bower | 3,696,850 | A | 10/1972 | Rosenblum |
| 1,206,618 | A | 11/1916 | Thrasher | 3,709,237 | A | 1/1973 | Smith |
| 1,251,560 | A | 1/1918 | Myshow | 3,727,786 | A | 4/1973 | Fausel |
| 1,263,294 | A | 4/1918 | Taylor | 3,732,978 | A | 5/1973 | Reader |
| 1,308,268 | A | 7/1919 | Wagner et al. | 3,733,758 | A | 5/1973 | Maier et al. |
| 1,360,844 | A | 11/1920 | Williams | 3,796,342 | A | 3/1974 | Sanders et al. |
| 1,394,007 | A | 10/1921 | Hall | 3,799,384 | A | 3/1974 | Hurkamp |
| 1,520,532 | A | 12/1924 | Clark | 3,807,421 | A | 4/1974 | Geiger et al. |
| 1,538,260 | A | 5/1925 | Street et al. | 3,834,528 | A | 9/1974 | Pickford et al. |
| 1,581,888 | A | 4/1926 | Thomas | 3,843,222 | A | 10/1974 | Berkun |
| 1,583,083 | A | 5/1926 | Macaraig | 3,868,155 | A | 2/1975 | Cherubini |
| 1,640,083 | A | 8/1927 | Ladd | 3,880,459 | A | 4/1975 | Kelley |
| 1,647,679 | A | 11/1927 | Williams | 3,883,026 | A | 5/1975 | Selz |
| 1,691,904 | A | 11/1928 | Gamble | 3,893,649 | A | 7/1975 | Cornell et al. |
| 1,703,066 | A | 2/1929 | Horn | 3,935,958 | A | 2/1976 | Frangos |
| 1,836,297 | A | 12/1931 | Vienna | 3,946,903 | A | 3/1976 | Parker |
| 1,979,978 | A | 11/1934 | Martin | 3,955,706 | A | 5/1976 | Whitaker |
| 1,994,235 | A | 3/1935 | Solomon | 3,960,161 | A | 6/1976 | Norman |
| 1,999,424 | A | 4/1935 | Seitz | 3,987,580 | A | 10/1976 | Ausnit |
| 2,009,035 | A | 7/1935 | Towers | 3,990,463 | A | 11/1976 | Norman |
| 2,042,888 | A | 6/1936 | Flood | 4,010,784 | A | 3/1977 | Nattrass et al. |
| 2,057,942 | A | 10/1936 | Fay | 4,055,239 | A | 10/1977 | Weiner |
| 2,071,850 | A | 2/1937 | Miller | 4,073,105 | A | 2/1978 | Daugherty |
| 2,115,308 | A | 4/1938 | Koch | 4,094,639 | A | 6/1978 | McMillan |
| 2,136,761 | A | 11/1938 | Simmons | 4,118,089 | A | 10/1978 | Johnson et al. |
| 2,182,932 | A | 12/1939 | Sanford | 4,133,149 | A | 1/1979 | Angress |
| 2,269,574 | A | 1/1942 | Benenfeld | 4,134,225 | A | 1/1979 | Welch |
| 2,280,601 | A | 4/1942 | Otter | 4,165,757 | A | 8/1979 | Marks |
| 2,295,584 | A | 9/1942 | Larson | 4,170,082 | A | 10/1979 | Freedman |
| 2,298,786 | A | 10/1942 | Dubofsky et al. | 4,180,113 | A | 12/1979 | Liebling |
| 2,361,743 | A | 10/1944 | Butler | 4,195,804 | A | 4/1980 | Hujsak et al. |
| 2,544,074 | A | 3/1951 | Ernst et al. | 4,212,130 | A | 7/1980 | Walker |
| 2,575,893 | A | 11/1951 | Seaman | 4,246,945 | A | 1/1981 | Sterling |
| 2,600,501 | A | 6/1952 | Higgs | 4,248,278 | A | 2/1981 | Blodgett |
| 2,625,973 | A | 1/1953 | Weldon et al. | 4,248,442 | A | 2/1981 | Barrett |
| 2,639,819 | A | 5/1953 | Marks | 4,265,261 | A | 5/1981 | Barker |
| 2,664,131 | A | 12/1953 | Miller | 4,287,701 | A | 9/1981 | Washington |
| 2,710,084 | A | 6/1955 | Braverman | 4,299,365 | A | 11/1981 | Battle |
| 2,721,099 | A | 10/1955 | Rupp | 4,313,634 | A | 2/1982 | Williams |
| 2,724,537 | A | 11/1955 | Fehr | 4,352,457 | A | 10/1982 | Weick |
| 2,746,582 | A | 5/1956 | Cart | 4,401,213 | A | 8/1983 | Lerner |
| 2,767,757 | A | 10/1956 | Marder | 4,411,300 | A | 10/1983 | Rico |
| 2,778,560 | A | 1/1957 | Pfeiffer | 4,427,110 | A | 1/1984 | Shaw, Jr. |
| 2,780,402 | A | 2/1957 | Zucker et al. | D274,662 | S | 7/1984 | Fausel |
| 2,833,460 | A | 5/1958 | Votolato | 4,485,855 | A | 12/1984 | Dillingham |
| 2,879,553 | A | 3/1959 | Keating | D279,249 | S | 6/1985 | Fausel |
| 2,958,357 | A | 11/1960 | Vorgan | 4,580,776 | A | 4/1986 | Burkinshaw |
| 3,014,516 | A | 12/1961 | Mueller | 4,585,283 | A | 4/1986 | Redmon et al. |
| 3,017,117 | A | 1/1962 | Klingler | 4,603,432 | A | 7/1986 | Marino |
| 3,061,396 | A | 10/1962 | Hock | 4,610,394 | A | 9/1986 | Bryson |
| 3,126,933 | A | 3/1964 | Mason et al. | 4,630,312 | A | 12/1986 | Milstein |
| 3,160,307 | A | 12/1964 | Morrison | 4,630,747 | A | 12/1986 | Chiang et al. |
| 3,233,644 | A | 2/1966 | Bono | D288,019 | S | 1/1987 | Gebhard et al. |
| 3,257,077 | A | 6/1966 | Corning | 4,635,411 | A | 1/1987 | Kurzen |
| 3,260,396 | A | 7/1966 | Buch | 4,646,802 | A | 3/1987 | Basore et al. |
| 3,265,284 | A | 8/1966 | Tompkins | D290,538 | S | 6/1987 | Basore |
| 3,310,089 | A | 3/1967 | Silverman | 4,683,927 | A | 8/1987 | Pyzer |
| 3,354,924 | A | 11/1967 | Birrell et al. | 4,697,357 | A | 10/1987 | Van Vilet |
| 3,373,925 | A | 3/1968 | Gatward | 4,706,845 | A | 11/1987 | Schnurer et al. |
| 3,410,328 | A | 11/1968 | Sasai | 4,715,572 | A | 12/1987 | Robbins, III et al. |
| D213,131 | S | 1/1969 | Hamilton | 4,716,918 | A | 1/1988 | Hayashida et al. |
| 3,439,865 | A | 4/1969 | Port et al. | 4,728,066 | A | 3/1988 | Lang et al. |
| D215,846 | S | 11/1969 | Curtin et al. | 4,730,748 | A | 3/1988 | Bane |
| 3,480,059 | A | 11/1969 | Schoening | 4,738,478 | A | 4/1988 | Bean, Jr. |
| | | | | 4,747,701 | A | 5/1988 | Perkins |

US RE37,924 E

Page 3

| | | | | |
|---|---|---|---|---|
| 4,759,518 | A | 7/1988 | Yardas | |
| 4,779,794 | A | 10/1988 | Moore | |
| 4,781,300 | A | 11/1988 | Long | |
| 4,783,031 | A | 11/1988 | Ebentheuer | |
| 4,784,248 | A | 11/1988 | Workman | |
| 4,790,029 | A | 12/1988 | LaFleur et al. | |
| 4,813,520 | A | 3/1989 | Lin | |
| 4,815,784 | A | 3/1989 | Zheng | |
| 4,825,892 | A | 5/1989 | Norman | |
| 4,854,501 | A | 8/1989 | Ricci | |
| 4,858,634 | A | 8/1989 | McLeese | |
| 4,862,602 | A | 9/1989 | Krill | |
| 4,876,829 | A | 10/1989 | Mattick | |
| 4,895,230 | A | 1/1990 | King | |
| 4,899,967 | A | 2/1990 | Johnson | |
| 4,903,584 | A | 2/1990 | Styles | |
| 4,925,102 | A | 5/1990 | Jones et al. | |
| 4,940,200 | A | 7/1990 | Sawyer et al. | |
| 4,946,118 | A | 8/1990 | Hastings | |
| 4,948,077 | A | 8/1990 | Gonzalez | |
| 4,951,333 | A | 8/1990 | Kaiser et al. | |
| 4,953,815 | A | 9/1990 | Beymer et al. | |
| 4,964,859 | A | 10/1990 | Feldman | |
| 4,989,749 | A | 2/1991 | Choi | |
| 4,995,487 | A | 2/1991 | Plath | |
| D315,432 | S | 3/1991 | Smith | |
| 5,009,189 | A | 4/1991 | Neff | |
| 5,022,767 | A | 6/1991 | Cardulla | |
| 5,024,262 | A | 6/1991 | Huang | |
| 5,027,748 | A | 7/1991 | Wolak | |
| 5,031,793 | A | 7/1991 | Chen et al. | |
| 5,035,460 | A | 7/1991 | Huang | |
| 5,036,999 | A | 8/1991 | Bitsch | |
| 5,038,812 | A | 8/1991 | Norman | |
| 5,054,507 | A | 10/1991 | Sparks | |
| 5,072,828 | A | 12/1991 | Irvine | |
| 5,082,219 | A | 1/1992 | Blair | |
| 5,090,588 | A | 2/1992 | Van Romer et al. | |
| RE33,842 | E | 3/1992 | Ebentheuer | |
| 5,116,138 | A | 5/1992 | Macsenti et al. | |
| 5,118,201 | A | 6/1992 | Cook | |
| 5,134,815 | A | 8/1992 | Pickett | |
| 5,137,044 | A | 8/1992 | Brady | |
| 5,143,283 | A | 9/1992 | Lancaster | |
| 5,174,462 | A | 12/1992 | Hames | |
| 5,195,649 | A | 3/1993 | Wolters | |
| 5,213,147 | A | 5/1993 | Zheng | |
| 5,222,513 | A | 6/1993 | Hilliard | |
| 5,253,775 | A | 10/1993 | Gould | |
| 5,263,672 | A | 11/1993 | He | |
| 5,273,142 | A | 12/1993 | Weber | |
| 5,301,705 | A | 4/1994 | Zheng | |
| 5,324,490 | A | 6/1994 | van Vlahakis et al. | |
| 5,335,805 | A | 8/1994 | Chen | |
| 5,356,024 | A | 10/1994 | Ho et al. | |
| 5,358,440 | A | 10/1994 | Zheng | |
| 5,375,267 | A | 12/1994 | Davis | |
| 5,382,087 | A | 1/1995 | Pouch | |
| 5,393,023 | A | 2/1995 | Callan | |
| 5,394,897 | A | 3/1995 | Ritchey et al. | |
| 5,411,046 | A | 5/1995 | Wan | |
| 5,429,437 | A | 7/1995 | Shaw et al. | |
| 5,437,384 | A | 8/1995 | Farrell | |
| 5,437,410 | A | 8/1995 | Babasade | |
| 5,449,083 | A | 9/1995 | Dougherty et al. | |
| 5,464,113 | A | 11/1995 | Ho et al. | |
| 5,467,794 | A | 11/1995 | Zheng | |
| 5,468,061 | A | 11/1995 | Friess et al. | |
| 5,472,280 | A | * 12/1995 | Rittmaster | 383/6 |
| 5,474,196 | A | 12/1995 | Fausel et al. | |
| 5,492,675 | A | 2/1996 | Brizard | |
| 5,560,385 | A | 10/1996 | Zheng | |
| 5,576,621 | A | 11/1996 | Clements | |
| 5,593,046 | A | 1/1997 | Katsuura et al. | |
| 5,664,596 | A | * 9/1997 | Zheng | 135/126 |
| 5,664,886 | A | 9/1997 | Hutchinson | |
| 5,671,479 | A | 9/1997 | Dedrick | |
| 5,722,446 | A | 3/1998 | Zheng | |
| 5,746,514 | A | 5/1998 | Orensten | |
| 5,762,530 | A | 6/1998 | Zheng | |
| 5,778,915 | A | 7/1998 | Zheng | |
| 5,800,067 | A | 9/1998 | Easter | |
| 5,816,279 | A | 10/1998 | Zheng | |
| 5,816,954 | A | 10/1998 | Zheng | |
| 5,827,104 | A | 10/1998 | Zheng | |
| 5,845,697 | A | 12/1998 | Zheng | |
| 5,853,313 | A | 12/1998 | Zheng | |
| D406,423 | S | 3/1999 | Kellogg et al. | |
| D407,765 | S | 4/1999 | Zheng | |
| 5,901,926 | A | 5/1999 | Zheng | |
| 5,910,038 | A | 6/1999 | Zheng | |
| 5,910,058 | A | 6/1999 | Zheng | |
| 5,927,793 | A | 7/1999 | McGrath, Jr. | |
| 5,938,496 | A | 8/1999 | Zheng | |
| 5,941,265 | A | 8/1999 | Zheng | |
| 5,964,533 | A | 10/1999 | Ziglar | |
| 5,967,357 | A | 10/1999 | Kellogg et al. | |
| 5,971,188 | A | 10/1999 | Kellogg et al. | |
| 5,975,101 | A | 11/1999 | Zheng | |
| 5,992,045 | A | 11/1999 | Kellogg et al. | |
| 5,992,676 | A | 11/1999 | Taxi | |
| 6,006,772 | A | 12/1999 | Zheng | |
| 6,059,912 | A | 5/2000 | Kellogg et al. | |
| D431,361 | S | 10/2000 | Kellogg et al. | |
| D433,810 | S | 11/2000 | Kellogg et al. | |
| D438,009 | S | 2/2001 | Kellogg et al. | |
| 6,220,998 | B1 | 4/2001 | Kellogg et al. | |

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6A



FIG. 6B



FIG. 7



FIG. 8



FIG. 9

FIG. 10

FIG. 11

FIG. 12



FIG. 13



FIG. 14

FIG. 15

FIG. 16

FIG. 17





FIG. 22A

FIG. 22B



FIG. 23



FIG. 24A

FIG. 24B



FIG. 25



FIG. 26A

FIG. 26B



FIG. 27



FIG. 28



FIG. 29



FIG. 30



FIG. 31

FIG. 34

FIG. 32

FIG. 35

FIG. 33

FIG. 36

US RE37,924 E

1

# COLLAPSIBLE CONTAINER AND METHOD OF MAKING AND USING SAME

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.

## BACKGROUND OF THE INVENTION

The present invention relates generally to household products and specifically to a collapsible container with handles and a method of making and using such a container for convenient storage and transportation of said items.

A typical household often encounters the need for temporary storage of garments prior to washing or cleaning. Regardless of the place where laundry or cleaning is done, either at home or in a commercial setting, soiled garments need to be sorted, stored, and eventually transported to a designated place. The present invention can be utilized for garment sorting, storage and transportation. At the same time, the present invention can also be used for other purposes, such as storage or transportation of toys or other objects. Accordingly, its use is not to be limited to storage or transportation of soiled garments.

Numerous devices are known in the art to provide effective storage of soiled garments, for example laundry baskets, conventional hampers, or clothing bags. For example, U.S. Pat. No. 2,625,973 to Weldon et al. teaches a laundry hamper comprising a rectangular frame having upper and lower portions that telescope within one another in a detachable manner. The lower portion includes a base frame, while the upper portion comprises a top frame. A cover is secured by a hinge to the top frame and an outer bag surrounds the rectangular frame. A plurality of small inner bags are provided within the outer bag. U.S. Pat. No. 1,581,888 to Thomas discloses a collapsible receptacle comprising two rectangular wire frames, hingedly secured together, means for holding the frames to form a triangularly shaped structure, and a fabric portion covering the frames and providing an enclosure.

However, all these prior art devices are voluminous in their expanded state, are uneasy to fold or collapse, are still relatively voluminous in their collapsed state, and are difficult to manipulate. The present invention solves the above-mentioned shortcomings and provides a convenient, easy to manipulate, and ergonomic means for storing or transporting garments or other objects.

## SUMMARY OF THE INVENTION

The present invention relates generally to household products and specifically to a collapsible container and method of making and using the same.

According to the present invention, the foregoing and other advantages are obtained by providing a collapsible container comprising a plurality of side panels and a floor panel forming an enclosure having an open top. In the preferred embodiment, each side panel comprises a flexible continuous loop frame, a web of material, and an edging material. The edging envelops the frame and is coupled to the periphery of the web. The floor panel is attached to the bottom side of each side panel thus forming the container.

In an alternate embodiment, each side panel is attached to a side panel separator, which in turn is connected to the next adjacent side panel. The floor panel is attached to both the bottom side of each side panel and to the side panel separators, thus providing means for holding articles within the container and for supporting the container in its expanded state.

In accordance with an aspect of the invention, at least one handle member is coupled to opposite side panels at the open top of the container. Alternatively, the handle may be coupled to only one side panel or may be an aperture formed within one or more of the side panels.

In accordance with another aspect of the invention, an optional storage pouch may be coupled to one of the side panels at the open top of the container. The present invention is easily collapsed into a compact state and the pouch allows storage of the container in its collapsed, compact state.

In another alternate embodiment, the collapsible container further comprises a divider panel, the divided panel being attached to diagonally opposite edgings of the side panels. In yet another alternate embodiment, the collapsible container further comprises at least two divider panels, preferably arranged substantially parallel to each other and being coupled to opposite side panels to create at least three separate compartments within the container.

A preferred method of manufacturing the collapsible container includes the steps of attaching each handle member to a side of two opposite webs. The edging is next coupled to each web such that the edging surrounds the perimeter of the web and forms a channel or pocket through which the frame will later be inserted. After the requisite number of side panels has been formed, each side of the floor panel is attached to the bottom side of each side panel. Next, a side of each side panel is connected with a side of an adjacent side panel. The frame for each side panel is inserted through the channel formed by each edging. The ends of each frame member are connected, preferably using a crimped butt connector, to give the collapsible container its ability to freely stand in a rigid, expanded, upright state.

An alternate method of manufacturing the collapsible container includes the steps of attaching each handle member to a side of two opposite webs. Coupling the edging to each web such that the edging surrounds the perimeter of the web and forms a channel or pocket through which the frame will later be inserted. After the requisite number of side panels has been formed, each corner of the floor panel is attached to one end of each side panel separator. Next each side panel is connected with one side of the floor panel and with two adjacent side panel separators. The frame for each side panel is inserted through the channel formed by each edging. The ends of each frame member are connected, preferably using a crimped butt connector, to give the collapsible container its ability to freely stand in a rigid, expanded, upright state.

From the expanded state, the container can be folded and collapsed for storage or transportation. The preferred steps of collapsing the container include grasping opposite corners of the floor panel and biasing one corner toward the other until all side panels are adjacent and overlay each other. The container is now partially collapsed but each side panel is still in an expanded state. Next, the handle members and the floor panel are inserted in between any two of the adjacent overlaying side panels. By rotating two opposite corners of the flattened, overlaying side panels in opposite directions while biasing the two corners toward each other, the structure will form three overlaying circular loops folded adjacently. Finally, the three overlaying loops are placed into the storage pouch. The pouch prevents the container from springing back into its fully expanded condition.

## DESCRIPTION OF THE DRAWINGS

FIG. **1** is a front plan view of the collapsible container.

FIG. **2** is a side plan view of the collapsible container.

US RE37,924 E

3

FIG. 3 is a top plan view of the collapsible container.

FIG. 4 is a perspective view of the collapsible container.

FIG. 5 is a front plan view of the preferred embodiment of the collapsible container.

FIG. 6A is a side plan view of the collapsible container.

FIG. 6B is a partially cut-away view from FIG. 2A showing the frame member 22.

FIG. 7 is a top plan view of the collapsible container.

FIG. 8 is a perspective view of the collapsible container.

FIGS. 9–12 depict four alternative embodiments of the collapsible container, namely showing different handle configurations.

FIG. 13 is a perspective view of the collapsible container including a storage pouch.

FIG. 14 is a front plan view of a fifth embodiment of the collapsible container, namely a two-compartment container.

FIG. 15 is a side plan view of a fifth embodiment of a fifth embodiment of the collapsible container.

FIG. 16 is a top plan view of a fifth embodiment of the collapsible container.

FIG. 17 is a perspective view of a fifth embodiment of the collapsible container.

FIG. 18 is a front plan view of a sixth embodiment of the collapsible container, namely a three-compartment container.

FIG. 19 is a side plan view of a sixth embodiment of a fifth embodiment of the collapsible container.

FIG. 20 is a top plan view of a sixth embodiment of the collapsible container.

FIG. 21 is a perspective view of a sixth embodiment of the collapsible container.

FIGS. 22A through 30 depict the preferred method of manufacturing the collapsible container.

FIGS. 31 through 36 depict the method of collapsing the collapsible container.

DETAILED DESCRIPTION

Although the disclosure hereof is detailed and exact to enable those skilled in the art to practice the invention, the physical embodiments herein disclosed merely exemplify the invention which may be embodied in other specific structure. While the preferred embodiment has been described, the details may be changed without departing from the invention, which is defined by the claims.

The present invention, a collapsible container 10, is illustrated in FIGS. 1 through 4.

As shown in FIG. 4, the container 10 comprises four rectangular side panels 20, a floor panel 50, and two handles 60 and 62. The side and floor panels 20 and 50 are connected to one another to form a substantially rectangular container having an open top 16.

Referring to FIGS. 1 and 2 and as seen in detail in FIG. 6A, each side panel 20 further comprises a frame 22, a web 24, and an edging 26. The frame 22 is flexible, preferably formed from a sufficiently stiff yet resilient, material such as spring steel wire or plastic, and is contained within the channel or pocket 25 formed by the edging 26. The frame 22 forms a continuous loop. Preferably, the frame 22 has a rectangular cross-section, but a material with a different geometric cross-section can be used. The web 24 is a flexible foldable material, such as nylon cloth or nylon mesh, but can be any suitably flexible material. The nylon, or other flexible material, may be solid or perforated. The perimeter of the

4

web 24 is stitched to the edging 26 such that the edging 26 forms a pocket 25 about the periphery of the web 24. The edging 26 is a foldable, but stretch-resistant material capable of housing the frame 22 within its pocket 25. The edging 26 has two ends 27 and 29.

A seam cover 28, also made out of a foldable stretch-resistant material, may be provided to cover the ends 27 and 29 of the edging 26, thereby protecting the frame 22 from escaping out of the edging 26. As shown in FIG. 1, the seam cover 28 is also stitched to the web 24.

As shown in FIG. 7, the floor panel 50 is also a foldable web of material and has a generally rectangular shape. The floor panel 50 has four corner sections 52, 54, 56, 58 and is attached to four substantially perpendicular sides 51, 53, 55, 57 of each side panel 20. The floor panel 50 provides means for holding the garments or other objects (not shown) within the container 10 and for supporting the container 10 in its expanded state.

Referring now to FIGS. 5–8, the preferred embodiment of the collapsible container 10 is shown. The preferred embodiment includes side panel separators 40 located between each side panel 20. However, it should be noted that the side panel separators 40 are not required to practice the present invention. The side panel separators 40 are shown to be substantially longitudinal, each including an end 42 attached preferably by means of stitching to one of the corner sections 52, 54, 56, 58 of the floor panel 50. The other end 44 of each separator 40 corresponds to the open top 16 of the container 10. The side panel separators 40 are preferably formed from a stretch-resistant material similar to the material used for the seam covers 28 or the edging 26.

As shown in FIG. 6A, each rectangularly-shaped side panel 20 includes a top side 32 corresponding to the open top 16 of the container 10, a floor side 34 attached to one of the sides 51, 53, 55, 57 of the floor panel 50, and two lateral sides 36 and 38. Referring just to FIG. 6A, each lateral side 36 and 38 is attached to a side panel separator 40 adjacent to the side panel 20.

As depicted in FIGS. 4 and 8, the handles 60 and 62 have both ends connected to the top side 32 of two opposing side panels 20. The handles 60 and 62 are formed from a stretch-resistant material having a mesh web that extends between a portion of each strap side. The handles for the present invention are not limited to the particular type shown in FIGS. 4 and 8. Several alternate embodiments are shown in FIGS. 9 through 12, illustrating different handle members. In FIG. 9, the handle members 60 and 62 are straps stitched to opposite side panels. FIG. 10 depicts an alternate embodiment wherein the handle members 60 and 62 are apertures or openings formed in the webs 24 of two opposite side panels 20. In FIG. 11, one handle member 60 is shown as a strap coupled to diagonally opposed side seam separators 40. In FIG. 12, the handles 60 and 62 are preferably stitched directly to the webs 24 of two opposite side panels 20.

As shown in FIG. 13, an optional storage pouch 70 may be formed from a foldable material, such as nylon mesh, and stitched to the side 32 of one of the side panels 20. The storage pouch 70 is dimensioned to accommodate the container 10 in its collapsed state as later described.

Although stitching is presented as the preferred means for attaching or connecting the elements of the container 10 and permitting relatively convenient folding of the container 10, it is to be understood that other methods of attachment can be used in this invention. Such of methods may include heat sealing, gluing and the like. Accordingly, construction of the collapsible container should not be limited to stitching alone.

US RE37,924 E

| 5 | 6 |

FIGS. 14 through 17 depict an alternative embodiment of the collapsible container 12. The container 12 further includes a divider panel 80. Divider panel 80 is connected to opposite side seam separators 40 thereby dividing the interior of the container 12 into two separate chambers.

FIGS. 18 to 21 show a second alternate embodiment of the collapsible container 14. The container 14 comprises six side panels 20 and two divider panels 80 and 82. The divider panels 80 and 82 are arranged substantially parallel to one another. Each divider panel 80 and 82 is made out of a foldable material, such as nylon mesh, and has two sides 86 and 88 stitched to webs 24 of two opposite side panels 20. The divider panels 80 and 82 separate the interior of the container 14 into three separate compartments for improved sorting and storage of objects.

FIGS. 22 to 30 show various stages in the manufacturing process of the preferred embodiment of collapsible container 10. Referring to FIGS. 22A and 22B, the step of stitching the handle 60 to the top side 32 of two (2) of the webs 24 is shown. Specifically, the stitching is shown at 90.

In FIG. 23, a seam cover 28 is partially stitched to side 21 of each of the four (4) webs 24. In the two (2) webs having handles 60 or 62, the seam cover 28 is placed and sewn opposite to the handle 60 or 62. Each seam cover 28 is preferably placed in the middle of the side 21 and includes a flap or unstitched portion, but it is to be understood that it could be placed anywhere on any side of each of the webs 24. Referring now to FIG. 24B, the edging 26 is then folded in a channel-like fashion around the periphery of the web 24 and stitched to the web 24, surrounding the perimeter of the web 24. The stitching is shown at 28. The stitched edging 26 forms a pocket 25 around the periphery of each web 24. In the preferred embodiment, each container 10 requires four (4) webs 20. The two (2) sides including the web 24, edging 26 and seam cover 28 are shown in FIG. 20 and the two (2) sides including the handle 60, web 24, edging 26 and seam cover 28 are shown in FIG. 25. Stitching of each edging 26 starts and ends at the seam cover 28, thereby leaving a small space between ends 27 and 29 of each edging 26.

In FIGS. 26A and 26B, the next step involves stitching each corner section 52, 54, 56, 58 of the floor panel 50 to the end 42 of each side panel separator 40. The stitching is shown at 46. Now referring to FIGS. 27 and 28, the step of attaching each of the four side panels 20 by means of stitching to the floor panel 50 and the side panel separators 40 is shown. The two (2) side panels 20 containing the handles 60 and 62 should be positioned opposite each other with the handles 60 and 62 facing inwardly toward each other. First, the floor side 34 of each of the side panels 20 is stitched to one of the sides 51, 53, 55, 57 of the floor panel 50 as shown in FIG. 23. Still referring to FIG. 23, next the lateral sides 36 of each of the side panels 20 is stitched to the corresponding adjacent side panel separator 40. As shown in FIG. 28, once the first lateral side 36 of a side panel separator 40 is stitched on one side, the second lateral side 38 of another side panel separator 40 is stitched to the other side. The resulting enclosure 90 is shown in FIG. 29.

As discussed previously, the container 10 may be constructed without the side panel separators 20. In constructing the embodiment without side panel separators, the two (2) side panels 20 containing the handles 60 and 62 are positioned opposite each other with their handles 60 and 62 facing inwardly toward each other. The floor side 34 of each of the side panels 20 is stitched to one of the sides 51, 53, 55, 57 of the floor panel 50. Next the lateral sides 36 of each of the side panels 20 are stitched to an adjacent side panel 20 thus forming the container 10 having an open top 16.

The final steps of the manufacturing process of the present invention involve inserting the frame 22 in one of the open ends 27 or 29 of each of the edgings 26 as shown in FIG. 30. The frame 22 is passed through the edging 26 and around the periphery of each of the side panels 20. The ends of the frame 22 are joined together such that the frame 22 forms a continuous loop. In the preferred embodiment, the frame ends are connected by inserting each end into a butt connector and crimping the connector. Finally, the unstitched portion of each seam cover 28 is stitched to side 21 of each web 24 and over the ends 27 and 29 of each edging 26, thereby protecting the frame 22 from escaping the edgings 26.

From the expanded state, the container 10 may be folded into a collapsed state for storage and transportation. FIGS. 31 to 36 show various steps for collapsing the container 10. Referring to FIG. 31, the first step requires grasping opposite sides of the container 10 and biasing one toward the other until all side panels 20 are adjacent and overlie each other. The next step includes inserting the frame members 60 and 62 and the floor panel 50 in between any two of the adjacent overlying side panels 20 is shown in FIG. 32. It is important to make sure that the storage pouch 70 remains outside of the collapsed side panels 20. In the preferred embodiment, the resulting partially collapsed container 10 is a stack of four side panels 20. FIGS. 33 and 34 show the next step of rotating two opposite corners 101 and 103 of the partially collapsed container 10 in opposite directions while biasing the corners 101, 103 toward each other. The container 10 will first twist and then will rotate to form three overlying circular loops 150 situated adjacently as shown in FIG. 35. The final step, shown in FIG. 36, is the insertion of the collapsed container 10 into the storage pouch 70.

When the collapsed container 10 is removed from the storage pouch 70, the frame members 22 will bias the container 10 into its fully expanded state. Again, the fully expanded state of the preferred embodiment is that shown in FIG. 4.

The foregoing is considered as illustrative only of the principles of the invention. Furthermore, since numerous modifications and changes will readily occur to those skilled in the art, it is not desired to limit the invention to the exact construction and operation shown and described. While the preferred embodiment has been described, the details may be changed without departing from the invention, which is defined by the claims.

What is claimed is:

1. A collapsible container having an open top, said collapsible container comprising:

a plurality of adjacent side panels, each of said side panels including a *continuous, non-interrupted, planar* web having a perimeter, an edging attached to substantially the entire perimeter of the web and forming a continuous peripheral pocket, and a continuous loop frame;

the frame being positioned within the continuous pocket;

each of said side panels having a bottom side, a top side and two lateral sides;

a floor panel having a plurality of sides, each of said floor panel sides being attached to at least one of said side panel bottom sides;

each of said lateral sides of each side panel being attached to the lateral side of an adjacent side panel.

2. The collapsible container of claim 1, further comprising at least one handle member, said handle member being secured to at least one of said side panels.

[3. The collapsible container of claim 1, further comprising at least one aperture being formed within at least one side panel.]

US RE37,924 E

7

**4**. The collapsible container of claim **1**, further including a storage pouch, said storage pouch being coupled to one of said side panels near said open top.

**5**. The collapsible container of claim **1**, wherein said side panels are substantially rectangular.

**6**. The collapsible container of claim **1**, wherein said plurality of side panels if four.

**7**. The collapsible container of claim **1**, wherein said frame of each of said side panels is flexible.

**8**. The collapsible container of claim **1**, wherein said plurality of side panels is an even number.

**9**. A collapsible container having an open top, said container comprising:

a plurality of side panels, each of said side panels including a web having a perimeter, an edging attached to the perimeter of the web and forming a pocket, and a continuous loop frame;

the frame being positioned within the edging pocket;

each of said side panels having a bottom side and at least two lateral sides;

a plurality of side panel separators, said panel separators each having a first end, a second end, and two lateral sides;

a floor panel having a plurality of sides and a plurality of corner sections, each of said floor panel sides being attached to the bottom side of at least one of said side panels;

each corner section of said floor panel being coupled to the first end of one of said side panel separators; and

each of said lateral sides of each side panel separator being attached to a lateral side of a side panel.

**10**. The collapsible container of claim **9**, further comprising at least one handle member, said handle member being secured to at least one of said side panels.

**11**. The collapsible container of claim **9**, further comprising a seam cover attached to said side panels and substantially enveloping a predetermined portion of said edging.

**[12**. The collapsible container of claim **9**, further comprising at least one aperture being formed within at least one side panel.**]**

**13**. The collapsible container of claim **9**, further including a storage pouch, said storage pouch being coupled to one of said side panels near said open top.

**14**. The collapsible container of claim **9**, wherein said panels are substantially rectangular.

**15**. The collapsible container of claim **9**, wherein said plurality of side panels is an even number.

**16**. The collapsible container of claim **9**, wherein said web of each of said side panels is flexible web of material.

**17**. The collapsible container of claim **9**, wherein said frame of each of said side panels is flexible.

**18**. A method of collapsing a collapsible container comprising a plurality of side panels, a floor panel, a plurality of side panel separators, at least one handle member, and a storing structure, said method comprising the steps of:

8

biasing a corner of said collapsible container toward an opposite corner until said side panels are adjacent and overlie each other;

inserting said handle members and said floor panel between two of said adjacent side panels;

rotating two opposite corners of said adjacent overlying side panels in opposite directions;

biasing said two corners toward each other and forming three adjacent circular loops overlying each other;

inserting said adjacent overlaying circular loops into said storing structure.

*19. A collapsible container having an open top, said container comprising:*

*a plurality of side panels, each of said side panels including a continuous, non-interrupted, planar web having a perimeter, an edging attached to the perimeter of the web and forming a pocket, and a continuous loop frame;*

*the frame being positioned within the edging pocket;*

*each of said side panels having a bottom side and at least two lateral sides;*

*a plurality of side panel separators, said panel separators each having a first end, a second end, and two lateral sides;*

*a floor panel having a plurality of sides and a plurality of corner sections, each of said floor panel sides being attached to the bottom side of at least one of said side panels;*

*each corner section of said floor panel being coupled to the first end of one of said side panel separators; and*

*each of said lateral sides of each side panel separator being attached to a lateral side of a side panel.*

*20. The collapsible container of claim 19, further comprising at least one handle member, said handle member being secured to at least one of said side panels.*

*21. The collapsible container of claim 19, further comprising a seam cover attached to said side panels and substantially enveloping a predetermined portion of said edging.*

*22. The collapsible container of claim 19, further including a storage pouch, said storage pouch being coupled to one of said side panels near said open top.*

*23. The collapsible container of claim 19, wherein said side panels are substantially rectangular.*

*24. The collapsible container of claim 19, wherein said plurality of side panels is an even number.*

*25. The collapsible container of claim 19, wherein said web of each of said side panels is flexible web of material.*

*26. The collapsible container of claim 19, wherein said frame of each of said side panels is flexible.*

*       *    *    *    *    *

**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
ASSISTANT SECRETARY AND COMMISSIONER
OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

SEPTEMBER 21, 1998

                              PTAS

JOHN M. MANION
10400 WEST NORTH AVENUE, STE. 450
MILWAUKEE, WI  53226

*100762655A*

                 UNITED STATES PATENT AND TRADEMARK OFFICE
                 NOTICE OF RECORDATION OF ASSIGNMENT DOCUMENT

THE ENCLOSED DOCUMENT HAS BEEN RECORDED BY THE ASSIGNMENT DIVISION
OF THE U.S. PATENT AND TRADEMARK OFFICE.  A COMPLETE MICROFILM COPY IS
AVAILABLE AT THE ASSIGNMENT SEARCH ROOM ON THE REEL AND FRAME NUMBER
REFERENCED BELOW.

PLEASE REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE.  THE
INFORMATION CONTAINED ON THIS RECORDATION NOTICE REFLECTS THE DATA
PRESENT IN THE PATENT AND TRADEMARK ASSIGNMENT SYSTEM.  IF YOU SHOULD
FIND ANY ERRORS OR HAVE QUESTIONS CONCERNING THIS NOTICE, YOU MAY
CONTACT THE EMPLOYEE WHOSE NAME APPEARS ON THIS NOTICE AT 703-308-9723.
PLEASE SEND REQUEST FOR CORRECTION TO:  U.S. PATENT AND TRADEMARK OFFICE,
ASSIGNMENT DIVISION, BOX ASSIGNMENTS, CG-4, 1213 JEFFERSON DAVIS HWY,
SUITE 320, WASHINGTON, D.C. 20231.


RECORDATION DATE: 07/01/1998        REEL/FRAME: 9298/0337
                                    NUMBER OF PAGES: 2

BRIEF:  ASSIGNMENT OF ASSIGNOR'S INTEREST (SEE DOCUMENT FOR DETAILS).

ASSIGNOR:
   KELLOGG, MICHAEL S.           DOC DATE: 07/01/1998

   ASSIGNOR:
   KROTTS, DEAN B.               DOC DATE: 07/01/1998

ASSIGNEE:
   BAJER DESIGN & MARKETING, INC.
   20875 ENTERPRISE AVENUE
   BROOKFIELD, WISCONSIN 53045

SERIAL NUMBER: 09108521             FILING DATE: 07/01/1998
PATENT NUMBER:                      ISSUE DATE:




DOROTHY RILEY, PARALEGAL
ASSIGNMENT DIVISION
OFFICE OF PUBLIC RECORDS


                                              **EXHIBIT 4**

FORM PTO-1595 (Modified)
(Rev 6-93)
OMB No. 0651-0011 (exp 4/94)
Copyright 1994-97 LegalStar
PO8/REV02

07-14-1998

Docket No. 1156-15049

HEET

U.S. DEPARTMENT OF COMMERCE
Patent and Trademark Office

Tab settings ➔ ➔ ➔ ▼

100762655

▼          ▼          ▼          ▼

To the Honorable Commissioner of Patents and Trademarks: Please record the attached original documents or copy thereof.

| 1. Name of conveying party(ies): | 2. Name and address of receiving party(ies): |
|---|---|
| Michael S. Kellogg; Dean B. Krotts | Name: **Bajer Design & Marketing, Inc.** |
| | Internal Address: |
| Additional names(s) of conveying party(ies)  ☐ Yes ☒ No | |

09/108521    07/01/98    Jc-560 U.S. PTO

| 3. Nature of conveyance: | |
|---|---|
| ☒ Assignment | ☐ Merger |
| ☐ Security Agreement | ☐ Change of Name |
| ☐ Other | |

Street Address: **20875 Enterprise Avenue**

City: **Brookfield**    State: **WI**    ZIP: **53045**

Execution Date: **1 July 1998**

Additional name(s) & address(es) attached?  ☐ Yes ☒ No

4. Application number(s) or registration numbers(s):

If this document is being filed together with a new application, the execution date of the application is: **1 July 1998**

A. Patent Application No.(s)                  B. Patent No.(s)

Additional numbers attached?    ☐ Yes    ☐ No

5. Name and address of party to whom correspondence
corcerning document should be mailed:

Name: **John M. Manion**

Internal Address:

6. Total number of applications and patents involved: **1**

7. Total fee (37 CFR 3.41):................$ **40.00**

☒ Enclosed - Any excess or insufficiency should be credited or debited to deposit account

☐ Authorized to be charged to deposit account

Street Address: **10400 West North Avenue, Suite 450**

8. Deposit account number:

**23-1650**

07/14/1998 DNGUYEN 00000019 09108521
01 FC:581              40.00 DP

City: **Milwaukee**    State: **WI**    ZIP: **53226**

**DO NOT USE THIS SPACE**

9. Statement and signature.

*To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document.*

| **John M. Manion, Reg. No. 38,957** | | **1 July 1998** |
|---|---|---|
| Name of Person Signing | Signature | Date |
| Total number of pages including cover sheet, attachments, and document: | **2** | |

A S S I G N M E N T

In consideration of One Dollar ($1.00) and other good and valuable considerations, receipt of which is acknowledged, we, Michael S. Kellogg and Dean B. Krotts, being the lawful owners, hereby sell and assign to Bajer Design & Marketing, Inc., their successors and assigns, the entire right, title and interest throughout the world in our invention in A Collapsible Container and Method of Making and Using Same, as described in the attached application for United States patent, and in this and any and all U.S.A. and other patent applications and patents thereon, and in all rights of priority thereto.

Signed, sealed and delivered this _____1_____ day of _____July_____, 1998.

_Michael Kellogg_
Michael S. Kellogg

STATE OF WISCONSIN                    )
                                      )
COUNTY OF _Milwaukee_                 )

Personally came before me this __1__ day of _____July_____, 1998 the above named Michael S. Kellogg personally known to me to be the person who signed the above document, who acknowledged the same as his own free act and deed.

Notary Public _Christine M. O'Toole_
My Commission Expires _1 April 2001_

[SEAL]

Signed, sealed and delivered this _____1_____ day of _____July_____, 1998.

_Dean Krotts_
Dean B. Krotts

STATE OF WISCONSIN                    )
                                      )
COUNTY OF _Milwaukee_                 )

Personally came before me this __1__ day of _____July_____, 1998 the above named Dean B. Krotts personally known to me to be the person who signed the above document, who acknowledged the same as his own free act and deed.

Notary Public _Christine M. O'Toole_
My Commission Expires _1 April 2001_

[SEAL]



**EXHIBIT 5**

Int. Cl.: 21

Prior U.S. Cls.: 2, 13, 23, 29, 30, 33, 40, and 50

**United States Patent and Trademark Office**

Reg. No. 2,276,917

Registered Sep. 7, 1999

## TRADEMARK
### SUPPLEMENTAL REGISTER

## POP OPEN

BAJER DESIGN & MARKETING, INC. (WIS-
CONSIN CORPORATION)
20875 ENTERPRISE AVENUE
BROOKFIELD, WI 53045

FOR: COLLAPSIBLE CONTAINERS FOR
HOUSEHOLD USE, IN CLASS 21 (U.S. CLS. 2,
13, 23, 29, 30, 33, 40 AND 50).

FIRST USE 9-0-1997; IN COMMERCE
9-0-1997.

SER. NO. 75-568,363, FILED P.R. 10-9-1998;
AM. S.R. 5-25-1999.

NANCY CLARKE, EXAMINING ATTORNEY

**EXHIBIT 6**



08CV2296                    TG

JUDGE COAR

MAGISTRATE JUDGE DENLOW



# EXHIBIT 7



08CV2296            TG

JUDGE COAR

MAGISTRATE JUDGE DENLOW            **EXHIBIT 8**



**EXHIBIT 9**